Colin R. TREDREA and Douglas G. Wells, Appellees,

v.

ANESTHESIA & ANALGESIA, P.C., an Iowa Professional Corporation, Appellant,

and

Edwin A. Maxwell, Appellee.

Colin R. TREDREA and Douglas G. Wells, Appellants,

v.

GENESIS MEDICAL CENTER, Appellee.

No. 96–1117.

Supreme Court of Iowa.

Sept. 23, 1998.

Miles J. Zaremski, David G. Susler, and Bruce C. Nelson of Rudnick & Wolfe, Chicago, Illinois, for appellant Anesthesia & Analgesia.

Ralph W. Heninger of Heninger & Heninger, P.C., Davenport, and Deborah M. Tharnish of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellees Colin R. Tredrea and Douglas G. Wells.

Robert A. Van Vooren and Michael P. Byrne of Lane & Waterman, Davenport, for appellee Edwin A. Maxwell and Genesis Medical Center.

Considered by HARRIS, P.J., and LARSON, LAVORATO, SNELL, and ANDREASEN, JJ.

LARSON, Justice.

The Genesis Medical Center in Davenport, Iowa, signed a contract with Anesthesia and Analgesia, P.C. (A & A) under which A & A would provide anesthesiology services for Genesis. These plaintiffs, Colin R. Tredrea and Douglas G. Wells, had previously provided such services for the medical center. However, under this new contract, the services of A & A were to be exclusive, subject to a provision in the contract that other anesthesiologists, including these plaintiffs, could provide services under agreements with Genesis which were to be executed by a certain date. Any extensions in the deadline were subject to the consent of A & A. The Genesis–A & A agreement provided that A & A would not "unreasonably withhold" its consent to an extension of the deadline.

These plaintiffs, two independent anesthesiologists, attempted to enter into a contract with Genesis after the deadline. A & A consented to two extensions of the deadline

but refused to consent to a third. The plaintiffs sued several defendants, claiming to be third-party beneficiaries of the Genesis–A & A agreement. Their petition alleged that A & A had unreasonably refused the third extension and improperly interfered with the plaintiffs' right to contract with Genesis. A jury found for the plaintiffs, and A & A appealed. The plaintiffs cross-appealed from the court's dismissal of their claim against Genesis. We affirm on both appeals.

## I. *Facts.*

The plaintiffs, Colin R. Tredrea and Douglas G. Wells, were two of fifteen anesthesiologists on staff at Genesis as of October 1994. Seven of the other doctors were employees of A & A, which was a professional corporation of anesthesiologists organized as a group practice.

The anesthesiology department at Genesis had been suffering from a number of problems, including critical evaluations by the Iowa Board of Medical Examiners. As a result, Genesis decided to reorganize its system of employing anesthesiologists. Genesis reached this decision after conducting an extensive review process of the various models for delivering anesthesiology services. It eventually adopted a model under which it would enter into an exclusive contract with a single group of anesthesiologists. Genesis contacted all fifteen anesthesiologists on its staff, explained the new model, and requested bids for contracts.

In January 1995 Genesis signed the contract under which A & A would be the exclusive provider of anesthesiology services. Although the contract was "exclusive," it provided that Genesis could offer contracts to independent anesthesiologists, including these plaintiffs, during a limited time period. In relevant part the contract provided:

2. *Exclusivity.* During the term of this Agreement and any subsequent renewal, Contractor shall have the exclusive right to provide all anesthesiology services to in-patients and out-patients of the Hospital, including patients of any out-patient facilities established, directly or indirectly, by the Hospital.

Notwithstanding the foregoing, Contractor acknowledges that the Hospital intends to offer to enter into agreements with those anesthesia providers who are performing anesthesia services at the Hospital as of the date of this Agreement and who are identified on Schedule B hereto (the "Independent Contractors") under which Independent Contractors would continue to perform anesthesia services at the Hospital. Contractor agrees that the Hospital may contract with the Independent Contractors to provide anesthesia services in the Department, provided that such agreement shall, by no later than January 31, 1995, be in writing and shall provide that: (i) it shall expire no later than June 30, 1996, (ii) the Hospital shall not be obligated to renew the agreement upon the expiration of its initial term, and (iii) each Independent Contractor shall not be obligated to renew the agreement upon the expiration of its initial term, and (iv) each Independent Contractor shall abide by such rules, regulations and procedures with respect to the operation of the Department as may from time to time be established by the Medical Director.... *Contractor agrees that it shall not unreasonably withhold its consent to the Hospital's request for an extension of time to execute the agreement with Independent Contractors contemplated above,* provided that Hospital demonstrates that it has used good faith efforts to cause the execution of such agreements by the January 31, 1995 deadline and, provided further, that Contractor shall not, under any circumstances, be obligated to consent to an extension of time beyond March 1, 1995.

(Emphasis added.)

On January 10, 1995, Genesis sent a letter to Wells, Tredrea, and the other six on-staff independent anesthesiologists, advising them that A & A had been granted the exclusive contract and that any of them would be able to sign an "independent contractor" agreement under which they could provide anesthesiology services. The letter set a deadline of January 25, 1995, to execute these agreements. Initially, all eight doctors rejected the contract offer made to them. While the contract established a deadline of January

31, 1995, Genesis offered the plaintiffs three extensions. A & A consented to the first two extensions. The first extended deadline was February 2, then February 10, and then February 15 at 6 p.m. On February 17, the plaintiffs approached Genesis to sign the independent contractor agreements they had previously rejected. Genesis sought the approval from A & A for the extension, but A & A refused.

The plaintiffs sued Genesis, A & A, and Dr. Edwin A. Maxwell, the medical director of anesthesia services at the hospital, on theories of: (1) breach of medical staff bylaws, (2) third-party beneficiary breach-of-contract claims based on the Genesis–A & A contract, (3) promissory estoppel, and (4) intentional interference with prospective business advantage.

The district court granted Genesis summary judgment on all counts. Later, the plaintiffs filed a second amended petition against Maxwell and A & A, alleging a third-party beneficiary breach of contract and intentional interference with prospective business advantages and intentional interference with contractual relationships. The court dismissed the claims for interference with contractual relationships (apparently as against Maxwell and A & A), concluding that the bylaws were not a contract.

The trial began in March 1996 against Dr. Maxwell and A & A. The court granted Maxwell a directed verdict and dismissed him from the case. The court allowed the plaintiffs to prove damages only prior to June 30, 1996, an issue the plaintiffs raise in their cross-appeal. The jury returned judgments in favor of Wells against A & A for $310,560 and in favor of Tredrea against A & A for $306,352.

A & A moved for judgment notwithstanding the verdict, which was denied. It appealed from that decision. The plaintiffs cross-appealed the order dismissing the interference claim against Maxwell and the order granting a motion in limine of A & A and Maxwell to limit the period of recoverable damages. The plaintiffs also appealed the order granting Genesis a summary judgment. This court consolidated the two appeals.

## II. *The Issues.*

Although A & A presents its issues in a different format, we believe they may be most clearly stated as follows: (1) do the plaintiffs have any enforceable third-party rights under the Genesis–A & A agreement, (2) does substantial evidence support the plaintiffs' claims for breach of contract and interference with a prospective business advantage, and (3) did the court abuse its discretion in admitting certain evidence? The plaintiffs' cross-appeal contends the court erred in: (1) precluding them from proving damages beyond June 30, 1996 (the date on which any agreement between Genesis and the independent doctors would expire); (2) dismissing their contract claims based on Genesis' alleged breach of hospital bylaws; and (3) dismissing their claims against Dr. Maxwell and Genesis for interference with existing contracts and contractual relationships.

## III. *Scope of Review.*

*Motions for directed verdict and judgment notwithstanding the verdict.* We review the denial of motions for directed verdict and motions for judgment notwithstanding the verdict under essentially the same rules: sufficiency of the evidence. As to motions for judgment notwithstanding the verdict:

> Our only inquiry ... is whether there is sufficient evidence to justify submitting the case to the jury. A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence to support each element of the plaintiff's claims. A plaintiff must have presented more than a mere scintilla of evidence to avoid a defendant's motion for judgment notwithstanding the verdict. Evidence is substantial when a reasonable mind would find the evidence presented adequate to reach the same findings.

*Willey v. Riley*, 541 N.W.2d 521, 526 (Iowa 1995) (citations omitted).

The standard of review for denial of a motion for directed verdict is for correction of errors at law, and "where a defendant's

challenge is to the sufficiency of the evidence, we will affirm the trial court's denial of the defendant's motion for directed verdict if the plaintiff's claims are supported by substantial evidence." *Boham v. City of Sioux City,* 567 N.W.2d 431, 435 (Iowa 1997). The specific issue is whether there was sufficient evidence to submit the various claims to the jury.

## IV. *The Contract Suit.*

A & A contends that the court should not have submitted the plaintiffs' claim for breach of contract because (1) the plaintiffs were not third-party beneficiaries under the contract and therefore lacked standing to sue on the contract, and (2) in any event there was insufficient evidence to find a breach of the agreement by A & A.

■ A. *The plaintiffs' standing.* The contract language at the heart of this claim is set out in the statement of the facts. The specific language claimed by the plaintiffs to give them a claim against A & A as third-party beneficiaries is this:

Contractor [A & A] agrees that the Hospital [Genesis] may contract with the Independent Contractors [identified by name including these plaintiffs] to provide anesthesia services in the [surgery] department, provided that such agreement shall [be executed] no later than January 31, 1995, ... [and] shall expire no later than June 30, 1996. Contractor [A & A] agrees that it shall not unreasonably withhold its consent to the Hospital's request for an extension of time to execute the agreement with the Independent Contractors, contemplated above....

The agreement was signed by A & A and Genesis. The plaintiffs were identified as "independent contractors" in an exhibit attached to the agreement, but the plaintiffs did not participate in the drafting of the agreement, and they did not sign it. Nevertheless, the plaintiffs claim the right to sue for the enforcement of the agreement because, they claim, they are third-party beneficiaries.

■ We have adopted the following principles applicable in third-party beneficiary

cases as set out in the Restatement (Second) of Contracts:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

*Midwest Dredging Co. v. McAninch Corp.,* 424 N.W.2d 216, 224 (Iowa 1988) (quoting Restatement (Second) of Contracts § 302 (1979)). As we observed in *Midwest Dredging,* the primary question is whether the contract manifests an intent to benefit a third party. *Id.*

Using the terms of the Restatement of Contracts, A & A is the "promisor," the party sought by a third party to be bound by the agreement. Genesis is the "promisee" which, for reasons later discussed, stood to benefit from being able to sign a service agreement with the independent contractors.

A & A argues that there is no intent shown in the agreement to benefit these plaintiffs and that the agreement was solely for A & A to provide anesthesiology services in exchange for compensation by Genesis. "There simply is no promise to enter into contract with plaintiffs, nor does the language convey an intent that Plaintiffs have a contractual right to such an agreement," according to A & A.

■ We believe A & A misperceives the nature of the "intent" required for enforcement of a contract by a third-party beneficiary. The intent need not be to benefit a third party directly. As one writer explains,

[w]hen a contract is made, the two or more contracting parties have separate purposes; each is stimulated by various motives, some of which he may not be acutely conscious. The contract itself has no purpose, motive, or intent. The two parties

have purposes, motives and intentions; but they never have quite the same ones.

In third-party cases, the right of such party does not depend upon the purpose, motive, or intent of the promisor. The motivating cause of his making the promise is usually his desire for the consideration given by the promisee. In few cases will he be moved by a desire to benefit a third person. If A buys Blackacre of B and promises B to pay the price to C, he makes this promise in order to get Blackacre, not to benefit C; and this is true whether C is a creditor of B's or is B's dearly beloved daughter or is a home for imbeciles.

4 Arthur Linton Corbin, *A Comprehensive Treatise on the Working Rules of Contract Law* § 776, at 15–16 (1951) [hereinafter Corbin]. In the present case, Genesis desired to retain its right to hire additional anesthesiologists because Genesis needed their services. Genesis therefore negotiated with A & A for the right to hire independent contractors, and that agreement became a part of the Genesis–A & A contract. This authority continues:

> A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two others ... if the promised performance will be of pecuniary benefit to [the third party] and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.

Corbin § 776, at 18.

The bargaining by Genesis to preserve the rights of the independent contractors did not arise out of the kindness of its corporate heart. Evidence at trial established that Genesis' anesthesiology department had been criticized for several reasons. Genesis needed more anesthesiologists than A & A could furnish, so Genesis needed the right to contract with additional anesthesiologists. The agreement in question was clearly meant to apply to the plaintiffs; their names were included as independent contractors listed on a sheet attached to the agreement. The plaintiffs qualify as third-party beneficiaries of the agreement and therefore have standing to enforce A & A's promise not to "unreasonably withhold its consent to the Hospital's request" for the extension.

■ B. *Evidence of the breach by A & A.* A & A argues that, even if the plaintiffs qualify as third-party beneficiaries, A & A did not breach its agreement with Genesis by refusing to grant another extension of the deadline. The key language in the agreement is that A & A "agrees that it shall not unreasonably withhold its consent to the Hospital's request for an extension...."

Unreasonableness is clearly a fact issue uniquely suited for resolution by a jury. The jury apparently concluded that A & A did act unreasonably in withholding its consent for an extension.

The plaintiffs presented evidence of possible retaliation by A & A and suggests that this was the reason for its refusal to consent to the extension. The plaintiffs' evidence showed that the plaintiffs had been critical of A & A in connection with peer reviews at the hospital.

One plaintiff testified that A & A had excluded him from practicing anesthesiology at Genesis because the plaintiff had a lucrative practice and had voiced concerns about the peer-review system at the hospital, which plaintiffs characterized as "dysfunctional." The plaintiffs introduced evidence that their activism in connection with the peer-review process caused them problems with A & A.

The plaintiffs also introduced evidence concerning the reasons they were unable to comply with the deadlines imposed by the agreement. The eight "outside" anesthesiologists wrote a memorandum to Genesis on February 15, 1995, stating:

> Thank you for your communication received February 14, 1995. We would like to cooperate and facilitate this process, but are waiting for a response to our proposals both by the hospital and Anesthesia and Analgesia. We are unable to sign any documents by (6:00 PM) tonight.

> We look forward to discussion of our fair and pragmatic proposals.

Genesis' medical staff requested that A & A and Genesis not close the door on the plaintiffs and the other independent anesthesiologists. A letter of February 9 to the president of Genesis from its medical staff stated that, at a special meeting of the staff, "the motion was made that the Medical Staff would support the independent anesthesiologists to proceed to negotiate a mutually agreeable contract without a deadline. The motion was seconded and passed by direction. . . ."

In addition, the record includes a letter from the chairman of the surgery department noting that this department passed a resolution stating:

> The Surgery Department strongly advises every member of Anesthesia & Analgesia to act in the spirit of their contract and allow independent providers to sign the 18–month hospital contract by 3/1/95. . . . [T]here was a very strong consensus among department members that not allowing the independent anesthesia providers to sign the contract would not be in the best interest of the Medical Staff or in the best interest of patient care.

A memo from one of the other "outside" anesthesiologists gave reasons for their inability to comply with the last extended deadline of February 15:

> We felt we were attempting rapid discussion and needed more time to discuss matters with A&A and were waiting for a response in good faith and communicated that to Dr. Swearingen around 1:00PM February 15, 1995 well before the 6:00PM deadline.
>
> What followed was absolute advantage given to A & A with no concern for the service provided to patients, the surgeons and obstetricians, the hospital and community by these eight practitioners.

In considering the reasonableness of A & A's refusal of the last requested extension, we note that from the original deadline of January 31, 1995, to the end of the last extension agreed to by A & A, February 15, 1995, it was only fifteen days. The reasons given by A & A for its refusal to further extend the deadline (that A & A had begun negotiations with other providers and thus

"acted to protect itself under its contractual obligation to Genesis") apparently failed to persuade the jury. We believe that substantial evidence supports the jury's finding that A & A had acted unreasonably in denying the last extension.

## V. *The Tort Claim of Interference with Prospective Business Advantage.*

A & A challenges the sufficiency of the evidence of their alleged interference with a prospective business advantage (or occasionally in its argument as interference with a contract). We have stated the requirements for the tort of interference with a prospective business contract:

> Interference with a prospective contract is an intentional tort which requires a showing that the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff. The tort requires plaintiff to prove the following elements by a preponderance of the evidence:
>
> 1. The plaintiff had a prospective contractual relationship with a third person.
>
> 2. The defendant knew of the prospective relationship.
>
> 3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.
>
> 4. The interference caused either the third party not to enter into or to continue the relationship or that the interference prevented the plaintiff from entering into or continuing the relationship.
>
> 5. The amount of damage.

*Nesler [v. Fisher & Co.,* 452 N.W.2d 191,] 198–99 [ (Iowa 1990) ]. If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability.

*Willey,* 541 N.W.2d at 526–27 (citations omitted).

A & A does not challenge the sufficiency of the evidence as to requirements 1, 2, 4 or 5. However, it challenges the sufficiency of the evidence on the third requirement: that the defendant intentionally and improperly inter-

fered with the relationship in one or more particulars. *See id.* at 527 (quoting *Nesler,* 452 N.W.2d at 198–99).

The jury was instructed on the elements of this tort as set out above. The court further instructed that the interference must be "with the *predominant* purpose of financially harming or destroying the plaintiffs' business." *See id.* (if defendant acts for two or more purposes, his improper purpose must predominate) (emphasis added).

Much of the evidence on the interference claim overlapped with the evidence of unreasonableness in A & A's refusal to extend the contract's time as discussed in Division IV(B). The plaintiffs testified that A & A's personnel were envious of the plaintiffs' practice and resentful of the plaintiffs' public criticism of the peer-review system. After the final deadline, A & A offered contracts to five of the eight independent contractors, but did not offer one to these plaintiffs.

We conclude that there was substantial evidence for the jury to find an improper motive, retaliation against the plaintiffs, and to find that this improper motive predominated.

## VI. *The Medical Staff Bylaws as a Contract.*

■ The plaintiffs argue that Genesis, by entering into an exclusive agreement with A & A and a separate medical director's contract with Dr. Maxwell, "has revoked or curtailed the Plaintiffs' medical staff membership rights and clinical privileges to provide patient care. . . ." The plaintiffs claimed damages against Genesis on the theory it had breached the hospital's bylaws. They also alleged that Dr. Maxwell interfered with this relationship. Resolution of both claims turns first on whether the medical staff bylaws constitute a contract on which these plaintiffs may seek money damages.

We note, first, that these are medical staff bylaws, not hospital bylaws. Virtually all of the provisions about which the plaintiffs complain regarding staff privileges relate to duties owed to staff doctors by their peers, not by the hospital. These complaints involve alleged denial of due process by the revocation or curtailment of the plaintiffs' medical staff privileges, a matter vested by the bylaws in the medical staff. Article XII, section 2, provides that denial or suspension of medical staff privileges entitles a practitioner to a hearing. Article XII, section 4, provides for a hearing procedure, which shall be accorded by members of the medical staff. Under the bylaws, the hospital becomes involved in these matters only at the conclusion of the staff's hearing process. Article XII, section 4, provides for the board of directors to consider the proposed action by the medical staff unless appellate review is requested. If appellate review by the board is requested, the procedure is outlined in article XII, section 5(A)-(H). All these review processes were to be handled by the medical staff, not the hospital.

The district court did not rule on the legal issue of whether the bylaws constituted a contract between Genesis and its medical staff. Rather, it concluded that in any event Genesis had not breached the bylaws.

This court has never decided the precise issue of whether the bylaws should be treated as a contract under circumstances similar to those presented here. However, in an early case, we observed without detailed analysis that the types of provisions in question "were By-laws of the [medical] staff and not binding on the Governing Board [of the hospital]." *Natale v. Sisters of Mercy,* 243 Iowa 582, 595, 52 N.W.2d 701, 709 (1952).

A federal district court applying Iowa law in a diversity case predicted, without discussing *Natale,* that we would treat hospital medical staff bylaws as contracts. *Islami v. Covenant Med. Ctr., Inc.,* 822 F.Supp. 1361, 1370–71 (N.D.Iowa 1992) (suit against hospital and medical staff committee for breach of bylaws over suspension of staff privileges). The court in *Islami* stated that the majority rule is that staff bylaws do constitute a contract. *Id.* at 1370. Courts in other jurisdictions have considered the issue, reaching various conclusions. *See, e.g., id.* at 1370–71 (providing overview of case law from foreign jurisdictions); *see also* John Hulston, et al., *Do Hospital Medical Staff Bylaws Create a Contract?,* 51 J. Mo. B. 352, 355 n. 4 & 5 (1995) (citing numerous cases on both sides

of the issue of whether hospital bylaws create a contract).

One treatise demonstrates the abstrusity of any statement of a "general rule" on this question. On the one hand, it states:

A hospital's medical staff bylaws constitute a contract between the hospital and its medical staff, particularly where the hospital and its staff indicate an intent to be bound by their terms, but not otherwise.

41 C.J.S. *Hospitals* § 16, at 259 (1991) (footnotes omitted). However, the same source explained:

Hospital's staff bylaws which stated that they were "subject to the ultimate authority of the applicable governing bodies" did not give rise to binding contract between staff and hospital, and hospital thus could not be found guilty of breach of contract for failure to follow staff bylaws.

*Id.* at 259 n. 32 (citing *Munoz v. Flower Hosp.*, 30 Ohio App.3d 162, 507 N.E.2d 360 (1985)). (The bylaws in the present case state that they are "subject to the ultimate authority of the Board.")

A group of commentators has explained the difficulty in interpreting hospital bylaws:

Documents such as medical staff bylaws that seem to give parties rights and create obligations but which fall short of having all the criteria for a contract create a dilemma. The question ... could thus be [ ] are medical staff bylaws judicially enforceable at law or in equity and, if so, what will be the nature of that enforcement?

Resolution of the dilemma and the question may depend on how medical staff bylaws are defined or categorized. Are medical staff bylaws an agreement between the hospital and medical staff defining the rights and obligations of each? Or are they an outline of policy set by the governance board?

Hulston, 51 J. Mo. B. at 352 (footnote omitted).

In analogous cases involving employee handbooks claimed to have created a contract of employment we have said:

An implied contract of employment can arise from an employee handbook if: (1)

the handbook is sufficiently definite in its terms to create an offer, (2) it is communicated to and accepted by the employee so as to create an acceptance[,] and (3) the employee provides consideration.

*Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 375 (Iowa 1997).

Some cases have held that a hospital's bylaws cannot constitute contracts because the hospitals give no consideration for the agreement. Hospitals in some cases are required by statute to promulgate bylaws, so their compliance with the law is merely doing what they are required to do. In Iowa hospitals are required to implement rules for the granting of staff privileges; in 1994, when the Genesis staff bylaws were adopted, our law required the department of inspections and appeals to

require that a hospital establish and implement written criteria for the granting of clinical privileges. The written criteria shall include but are not limited to consideration of the ability of an applicant for privileges to provide patient care services independently and appropriately in the hospital; the license held by the applicant to practice; training, experience, and competence of the applicant; the relationship between the applicant's request for the granting of privileges and the hospital's current scope of patient care services, as well as the hospital's determination of the necessity to grant privileges to a practitioner authorized to provide comprehensive, appropriate, and cost-effective services.

1993 Iowa Acts ch. 108 (now found as Iowa Code § 135B.7 (1997)). The department complied with this mandate by adopting an administrative rule, Iowa Admin. Code r. 481–51.5(4).

Because the board of directors of Genesis was required to establish criteria for the granting of clinical privileges, it might well be argued that the board's compliance could not be adequate consideration to form a contract.

The responsibility for establishing criteria for staff privileges, as already noted, is placed on the board of directors. For vari-

ous reasons connected with Genesis, its prior method of delivering anesthesiology services before it entered into the exclusive contract with A & A was unsatisfactory. Consultants hired by Genesis recommended the change for a variety of reasons, all ultimately affecting the quality of care given at Genesis. The problems noted by the consultant included defects in the preadmission testing and evaluation practices, the scheduling of anesthesia coverage, and interpersonal relationships on the part of the anesthesiologists that create an "uncomfortable" environment in the operating room. Lack of adequate coverage of anesthesiology services was noted, and the consultant stated that under the preexisting system there was considerable bickering in the department. In fact, the department was characterized as "dysfunctional" and "disorganized" according to the report. In addition, the consultant noted a lack of accountability in the department that made problem resolution difficult.

Based on the consultant's study, several solutions were recommended. One of them was for the hospital to grant an exclusive contract to a group of anesthesiologists to the exclusion of any anesthesiologists not a member of the group. This was the model adopted by the hospital.

■ Analogizing to the test that we apply in employee handbook cases, we hold that, in order for bylaws such as these to be considered an agreement for continued employment, the plaintiffs must establish "with sufficient definiteness" that an offer of continued employment was a part of the agreement. *See, e.g., Jones,* 569 N.W.2d at 375. The right to continued staff privileges is not expressed in the bylaws, and for that reason this case must be distinguished from *Islami,* a case in which the plaintiff complained that he had the express right under the bylaws to receive notice and a hearing before suspension. 822 F.Supp. at 1372. In this case there is also a vast difference between a doctor's loss of staff privileges through some form of disciplinary sanction, such as in *Islami,* and the doctor's "loss" of staff privileges through his refusal to comply with the terms of the staff reorganization agreement.

A California case involved a very similar question involving a doctor who had failed to become a part of a departmental reorganization. The court held that he did not have a right to continued employment. In the process, the court stated that

where a doctor loses or does not attain staff privileges because of professional inadequacy or misconduct, the professional reputation of that doctor is at stake. In that circumstance, his or her ability to become a member of the staff at other hospitals is severely impaired. On the other hand, a doctor's elimination by reason of a departmental reorganization and his failure to sign a contract does not reflect upon the doctor's professional qualifications and should not affect his opportunities to obtain other employment. The trial court correctly found the decision to close the department of anesthesiology and contract with [an independent provider] did not reflect upon the character, competency or qualifications of any particular anesthesiologists.

*Mateo–Woodburn v. Fresno Community Hosp.,* 221 Cal.App.3d 1169, 1185, 270 Cal. Rptr. 894, 903 (1990). The plaintiffs in *Mateo–Woodburn,* like the plaintiffs here, were anesthesiologists on staff at the defendant hospital. The hospital was experiencing problems with the anesthesiology department and elected to hire a single anesthesiologist who would subcontract with others. As in the present case, the plaintiffs in *Mateo–Woodburn* refused to sign the subcontracts, contending they had the right under the hospital bylaws to continue providing services as before on an "open staff" basis. *Id.* at 1176, 270 Cal.Rptr. at 897. The open staff, however, had problems. *Id.* The result was that the hospital closed its anesthesiology department and contracted with an independent doctor. *Id.* at 1179–80, 270 Cal. Rptr. at 899. The plaintiffs had an opportunity to sign a subcontract but refused. *Id.* at 1181, 270 Cal.Rptr. at 900.

The California court held that the hospital had the authority to change the method of delivery of services without violating the plaintiffs' rights. The court dissolved a temporary injunction that had been ordered and

denied a permanent injunction. *Id.* at 1188–89, 270 Cal.Rptr. at 905. Although the *Mateo–Woodburn* case did not involve a contract theory of recovery against the hospital, that case confirms our view that there is a difference between a staff doctor's right to due process in a disciplinary action to which he is entitled under the express language of the bylaws and a claim for continued employment on an "open staff" basis, a matter which is not even mentioned in the bylaws.

Under our statutory scheme, the board simply must be allowed to make key decisions on the method of delivery of anesthesiology services that best suit the needs of its patients and most completely satisfies the requirements of the law. If the view of these plaintiffs prevailed, the hospital could not scale down or close a department, regardless of the advisability of doing so, without incurring liability to doctors who incidentally are affected. In keeping with this responsibility, Genesis had previously entered into exclusive contracts for the delivery of various services including emergency services, renal dialysis services, radiology, and pathology.

We will not imply an agreement for continued employment or staff privileges in these bylaws because we believe it would improperly impinge on the statutory mandate to the board of directors to establish criteria for staff privileges, perpetuate the problems that had led to the establishment of the independent contractor system, and ultimately affect the successful operation of the hospital. Such a contract, impacting as it would on the statutory responsibilities of the hospital on matters affecting staff qualifications, might well be argued to be against public policy. In any event, we conclude that continued staff privileges are not implied by the bylaws, and we will not give the bylaws the effect of a contract.

Accordingly, we hold that the district court did not err in dismissing the plaintiffs' claim based on the hospital bylaws.

## VII. *The Interference Claims.*

The plaintiffs cross-appeal from the court's dismissal of their claims against Dr. Maxwell and Genesis for their alleged interference (1) with the plaintiffs' existing contract, and (2) with the plaintiffs' prospective business relationship with other physicians on the medical staff.

A. *The claim of interference with an existing contract.* We held in the preceding division that the hospital bylaws did not constitute a contract insofar as any continuing right to staff privileges on the part of the plaintiffs. This automatically disposes of the plaintiffs' claim for interference with an existing contract; if there is no contract, there can be no interference. We therefore affirm on this issue.

■ B. *The claim of interference with potential business relationships.* The plaintiffs complain that the court erred in granting summary judgment on the plaintiffs' claim that the defendants tortiously interfered with the plaintiffs' potential business relationship with other physicians on the Genesis staff.

■ The tort of interference with prospective business advantage or contract requires intentional and improper interference with another's prospective contractual relation. *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 195 (Iowa 1990). The tort can be committed by inducing a third person not to enter into a prospective relation or preventing the other from acquiring or continuing such a relation. *Id.* We have said that

plaintiffs who allege tortious interference with prospective business relations are held to a strict standard of substantial proof "that the defendant acted with a predominantly improper purpose." *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984). In a competitive business setting, this rule of strict proof operates "to avoid opening the door to virtually limitless suits of a highly speculative and remote nature." *Page County Appliance Center v. Honeywell, Inc.*, 347 N.W.2d 171, 178 (Iowa 1984).

*Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 341 (Iowa 1991).

The plaintiffs have set forth no facts in their resistance to the motion for summary judgment from which a rational fact finder could conclude that Dr. Maxwell or Genesis

acted with a predominantly improper purpose. The district court properly entered summary judgment against the plaintiffs on this claim.

## VIII. *Evidence Rulings.*

Both the plaintiffs and A & A raise issues involving the trial court's rulings on evidence. The plaintiffs complain that the court erroneously restricted their proof of lost income to the time before June 30, 1996, which was the date that the original Genesis–A & A contract was set to expire. A & A complains that the court erred in allowing evidence regarding actions of certain members of A & A and their problems with peer reviews.

▬ A. *Limitation of period for recovery.* The court limited the plaintiffs' claim for future damages to the term of a Genesis–A & A contract, which would expire on June 30, 1996. The plaintiffs argue that they should have been able to present evidence that, while the initial contract would expire on that date, the contract would probably have been renewed on an annual basis until the doctors retired. (Wells expected to practice until 2010 and Tredrea until 2008.) If this is true, the plaintiffs claim, their damages could have been $4,358,434, based on a computation by a CPA.

The district court refused to allow evidence of any damage beyond the termination date of the Genesis–A & A agreement on the ground that it was too speculative. The plaintiffs complain that, while the original contract expired on June 30, 1996, the contract provided that it "shall" be renewed for successive one-year terms unless either party acted to terminate it.

The plaintiffs produced evidence that doctors in the area would have continued to work with the plaintiffs beyond June 30, 1996. Moreover, future patients would continue to use these plaintiffs' services based on their relationships in the past. These facts are sufficient to remove the matter of damages after June 30, 1996, from the category of speculative, according to the plaintiffs.

In this connection,

[c]ourts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated.

*Orkin Exterminating Co. v. Burnett,* 160 N.W.2d 427, 430 (Iowa 1968).

Several factors make the plaintiffs' loss of income after the expiration date of the contract speculative. First, even though the doctors apparently enjoy a large following of patients, that is only part of the picture. Genesis would still have to consent to the renewal of the contract. Perhaps even more problematic for the plaintiffs is the question of mitigation of damages, which would of course be required. How much they would make as outside anesthesiologists between June 30, 1996, and their anticipated retirement dates (in 2008 and 2010) would be highly speculative.

▬ Future income, being speculative in nature, requires that the trial court be given considerable discretion as to whether to submit an item of profits to the jury. *See* Corbin § 1022, at 142–43. An abuse-of-discretion standard of review is advocated by A & A, and the plaintiffs do not dispute it. We apply that rule here. We conclude that, for the reasons discussed, the district court did not abuse its discretion in ruling that any income postdating June 30, 1996, is too speculative to allow recovery for it.

▬ B. *Evidence regarding problems at the hospital.* A & A complains that the court erred in admitting evidence of problems arising out of the peer-review process at the hospital. Some of the evidence in question concerned allegations of substandard patient care, an alleged cover-up of problems in the peer reviews, and various procedures at Genesis that the plaintiffs alleged were used to retaliate against them. (The plaintiffs do not claim misconduct by A & A doctors, but they do complain that A & A doctors were upset

with the plaintiffs for bringing the peer-review problems to light.)

A & A contends that the probative value of this evidence was negligible and that the prejudice to A & A was substantial. The plaintiffs respond that the evidence was probative on the question of whether A & A unreasonably withheld permission for an extension of time or refused that extension of time for reasons that were not reasonable, such as retaliation.

█ The relevancy of evidence and the comparative effect of any prejudice weighed against the probative value are matters within the sound discretion of the trial court. *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 178 (Iowa 1990). We find no abuse of that discretion here.

We have considered other arguments raised in the case by both the plaintiffs and the defendants but conclude they are either subsumed in issues previously discussed or are clearly without merit.

We affirm the district court on both the appeal and cross-appeal.

**AFFIRMED.**