# IN THE COURT OF APPEALS OF IOWA

No. 14-0230
Filed March 25, 2015


**A. ANDREW MARTIN,**
      Plaintiff-Appellee,

**vs.**

**CHEMTECH, INC. and**
**DALE EASTMAN,**
      Defendants-Appellants.
_____


Appeal from the Iowa District Court for Dallas County, Randy V. Hefner, Judge.


The defendants appeal from the district court's judgment and award of damages in favor of the plaintiff in a fraudulent misrepresentation action. **AFFIRMED.**


Thomas M. Boes and Todd A. Strother of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellants.

Mitchell R. Kunert and Ryan W. Leemkuil of Nyemaster Goode, P.C., Des Moines, for appellee.


Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, C.J.**

Chemtech, Inc., and Dale Eastman, the defendants, appeal from the district court's judgment and award of damages for Andrew Martin in a fraudulent misrepresentation action. The defendants maintain that non-reliance provisions in agreements signed by Martin bar his claim of fraud. Alternatively, they maintain that Martin waived his right to avail himself of legal remedies for fraud. Because neither of these claims is preserved for our review, we do not consider them. The defendants also maintain the factual record does not support a finding of fraud as a matter of law. Because we find substantial evidence in the record supports the district court's finding of facts, and the facts support the district court's judgment in favor of Martin in the fraud action, we affirm the judgment and award of damages.

**I. Background Facts and Proceedings.**

In late 2010 and early 2011, Chemtech, Inc., was in need of new leadership and a cash infusion. Martin had lost his job due to corporate reorganization and was looking for the right employment and opportunity. Unfortunately, after much negotiation on the contract terms, a short-lived arrangement resulted in the parties subsequently parting ways, and Martin instigated this action.

Dale Eastman was a certified public accountant with his own CPA firm. The business and its difficulties were aptly recited by the district court:

> Chemtech, Inc., was established in 2003 by Eastman and Stan Harlan, owner of Summit Structured Settlements which, as its name suggests, brokers structured settlements. Chemtech sells chemical detergents designed for use in various businesses and industries, including carwashes and commercial poultry operations.

As of January 2011, Eastman and Harlan each owned 50% of the outstanding stock in Chemtech. As of that time, the financial statements indicate that Chemtech's paid-in capital was approximately $1.8 million.

Eastman has served as Chemtech's chief executive officer since its inception. During early 2011, Tim Johnson was Chemtech's president, Teri Dean was chief financial officer, and David McGregor was vice president of sales. Though Harlan was on the board of directors and carried the title of chief information officer, he was not involved in Chemtech's day-to-day business operations.

As CEO and in actual practice, Eastman was primarily responsible for corporate operations. He maintained close control over all aspects of corporate activities and directly supervised Johnson, Dean, and McGregor. He approved all financial statements prepared by Dean and held periodic meetings with the sales staff. Eastman regularly monitored the company's finances, customer base, and products.

Chemtech was experiencing serious operational and financial problems in late 2010 and early 2011. It had shown operating losses for every year since its inception. Its net operating loss in 2009 was approximately $409,000. As of April 2011, before the final 2010 financials were complete, Eastman was estimating a 2010 operating loss of approximately $73,000.

According to Eastman's estimates, prospects for 2011 were substantially better than past years, and he projected that Chemtech would or could generate $4 million in revenue and a $500,000 profit that year. The 2011 estimates were, however, based on several problematic assumptions. One assumption related to a product known as Nutrient Management Plus, or NMP, a chemical used to spray manure in commercial poultry operations to control odor and pests. Eastman estimated that revenue generated from the sale of NMP would be approximately $672,000 in 2011. Another assumption was that Chemtech would be successful in expanding its customer base and increasing the sale of other chemicals by approximately $1.9 million, a projection described as "very conservative."

The actual facts belie the accuracy and reasonableness of these estimates. In 2010 NMP sales generated over 35% of Chemtech's revenue. Historically NMP's performance had been inconsistent and erratic, a problem which plagued the product since Chemtech began to sell it in 2007-2008. NMP's inconsistent performance was attributed to environmental variables, such as temperature and humidity, and the condition of the manure. These performance issues resulted in customer dissatisfaction and a rapid decline in NMP sales. Complicating matters further, in early 2011 Chemtech's cost to purchase NMP increased three-fold. Chemtech

did not increase its price for NMP commensurately, perhaps for competitive reasons, but the result was a significant decline in the profit margin generated from NMP sales.

All of these facts relating to NMP were known to Eastman and Chemtech management team members in late 2010 and early 2011. All of the known facts pointed to a very likely decline in sales and profit from NMP sales in 2011 and future years.

In 2010 three customers, SunRise Farms, Sunbest Foods, and Southwest Iowa Egg, the customers responsible for purchasing most of the NMP sold by Chemtech, generated approximately $980,000 of Chemtech's total sales revenue of $2.2 million, or 44% of total revenue. Southwest Iowa Egg had stopped purchasing substantial product from Chemtech in August of 2010, a decision attributed to the NMP performance problems.

Additionally, commissions had not been paid to two salespersons for several years to the tune of $110,000.

The parties first began conversations which led to Martin retaining the services of an attorney and an accountant to review financial statements and documents. As the district court observed, Martin was responsible for his own "on-the-ground" due diligence. Eastman or Dean supplied 2010 financials and 2011 projections. Both Eastman and Dean indicated the 2011 projections were "conservative" or "ultraconservative." Martin requested 2011 projections at a higher sales level. As observed by the district court:

> Martin viewed the 2011 projections as "attainable," relying upon Eastman's "conservative" projections as well as the somewhat less bleak 2010 financial statements compared to 2009. He did not rely upon the 2012 projections, which painted an even rosier picture, because, in his view, these appeared to be "futuristic." Martin prepared his own spreadsheet in order to assess the financial package, and used even more conservative projections, but still based upon the information Eastman had provided.
> Martin also talked to Harlan about the company, and Harlan conveyed dissatisfaction with Chemtech's past performance. Thus Harlan and Eastman both told Martin that Chemtech had not been profitable in the past, a fact that was substantiated by financial statements. But Harlan did not disclose to Martin problems with

Chemtech products, employees, or customers, possibly because Harlan himself was unaware of these issues. Nor did Harlan make any representations to Martin regarding Chemtech's future revenue or provide Martin with financial projections that were "conservative" and "attainable," as Eastman did.

Without any commitment and with full disclosure, Martin also considered an opportunity to work with Kerry Ingredients and Flavours, a company in Janesville, Wisconsin. The position with Kerry would have paid $165,000 annually with a $10,000 signing bonus.

As Martin investigated the Kerry position, he continued meeting with Eastman and discussing contract terms. Although he requested permission to do so and was granted it, Martin did not meet with Dean and sales personnel during this period. At one point Marin accepted the Kerry position, but willingly worked to iron out the contract regarding the opportunity with Chemtech. After much negotiation, including Martin's insistence on various revisions to the seller's representations and warranty clauses of the contract, the contracts were signed on June 9, 2011.[1] A stock purchase agreement provided Martin would purchase twenty-five percent of Chemtech's class A common stock for $150,000. The employment agreement was summarized by the district court, stating:

> Employment Agreement provided that Martin would serve as Chemtech's president and chief operating officer for an initial term of 24 months. The contract term would automatically renew for succeeding 24 month terms unless terminated by one of the parties. The contract could only be terminated for "good cause" during the initial term. Martin's salary was $50,000 annually, substantially less than he had made with his previous employer and substantially less than the Kerry offer. But Martin believed the Chemtech offer was the superior offer, both because he would not

---

[1] The parties signed the documents on May 23, 2011, with some handwritten changes and agreed the attorneys would provide clean copies of the documents, which were subsequently signed on June 9, 2011.

have to relocate his family and because he was entitled to a bonus if gross revenues reached certain levels. The first bonus, in the amount of $100,000, would have been due when annual gross revenues exceeded $5 million, which was approximately $1 million more than Eastman projected as gross revenues for 2011. In accepting the Chemtech position, Martin was clearly relying upon the company's potential as Eastman represented.

Martin began working at Chemtech on May 23 while Eastman had left on vacation. Soon thereafter, the relationship unraveled.

The unraveling of the relationship is pertinently described by the district court, stating:

> Very quickly [Martin] began to question the Eastman projections. On May 26 he requested sales reports organized by salesperson and customer, monthly sales by product, and 2011 year to date financial statements. Dean provided these spreadsheets on May 31, noting that Eastman had not approved the actual first-quarter reports and that she had not yet completed the April reports. The reports she did provide showed that actual revenue was not matching the projections. Actual revenue was approximately $193,000 less than the projections for the first quarter alone.
>
> Martin testified that the information provided by Dean created a "sense of urgency." Martin contacted David McGregor and Tim Johnson to discuss the declining revenue. At this meeting McGregor and Johnson told Martin that "three or four customers had left," a fact not previously disclosed to Martin. Martin's concerns intensified when he received the final first quarter 2011 reports along with the April sales figures from Dean.
>
> Despite these concerns, Martin signed the revised contract documents on June 9. He testified that he viewed these revised documents as a formality because he had signed the earlier contract documents with the agreed upon handwritten changes. He did not pay the $150,000 purchase price for the stock, presumably because of his growing concern over the sales numbers.
>
> Martin also began to question Chemtech's accounts payable, including commissions owed to its own sales personnel. Dean sent an email to Martin on June 16 with a "discussion draft" of the May numbers, noting that her staff was compiling more accurate figures. The January to May financials revealed revenue which was two-thirds less than projections and a $70,000 operating loss.

Martin informed Dean on June 16 that he needed to discuss loss of the Sunbest, Southwest Iowa Egg, and SunRise Farms business and the NMP product price increase. He questioned whether that price change had been "reflected in the 2011 budget." Dean responded on that same day advising Martin that Sunbest had moved its business to one vendor by the end of March, and that sales to Southwest Iowa Egg had ended in August or September of 2010. SunRise distribution "changed April 2011." Chemtech had changed vendors for NMP in January of 2011 resulting in an almost $10 per gallon increase in the price of that product. Dean claimed that the NMP price change was reflected in the 2011 projections.

Tim Johnson forwarded an earlier email thread to Martin on June 22 which confirmed what Martin by then suspected. That email thread, dating back to February, included communication between McGregor and Eastman concerning the loss of the Sunbest business and discussion of the problems with NMP.

. . . .

A meeting was held on June 17 involving Eastman, Johnson, Martin, and Harlan. According to Martin, Harlan was "agitated" and "frustrated" when he learned of the actual state of affairs. Subsequently Eastman bought Harlan's stock, largely by absolving him of liability for corporate debt Harlan had personally guaranteed. Martin's employment with Chemtech ended sometime during the week of June 19. . . .

Subsequently, Martin reinitiated his search for employment including the position at Kerry, but it had been filled and no position existed for him. At the time of trial, Martin had only earned "a couple thousand dollars" since June of 2011 in a joint venture.

The district court also described the essence of the parties' dispute in respect to the contract terms:

The Stock Purchase Agreement included representations and warranties for both sellers and buyer. As pertinent to this action, Eastman focuses on the contract provisions in which Martin acknowledged that investing "in the Class A capital stock [of Chemtech] involve[d] significant risk," that he had "been afforded [the opportunity] to conduct any and all due diligence he has requested and is familiar with the financial records and business operations of the Company," and that Martin "is making this investment based solely on his own analysis and investigation and not upon any representation, warranty or guarantee of the Company or its current shareholders."

Martin naturally focuses upon other contract terms. The terms Martin relies upon, in summary, required Chemtech,

Eastman and Harlan to fully disclose liabilities and obligations and provide accurate company financial statements. The Stock Purchase Agreement in part provided:

> No representation or warranty of Company in this Agreement and no statement in any instrument, certificate or other document Company or either of Shareholders delivers to Purchaser in connection with the transactions contemplated by this Agreement does or will omit to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, misleading. There is no fact known to Company or either of Shareholders that has specific application to either Company or its business [other than general economic or industry conditions] and that has a material adverse effect on the assets, business, prospects, financial condition, or results of operations of Company that has not been set forth in the Agreement or disclosed in writing to Purchaser.

Martin also negotiated for specific representations and warranties that covered the time from the date of the financial statements to the date of closing. These terms included representations and warranties that there had been no "material adverse change in the business, operations, properties, prospects, assets, or condition of [Chemtech], and no event has occurred or circumstance exists that may result in such a material adverse change." The Stock Purchase Agreement also stated that the representations and warranties would be "true at the time of the Closing as though such representations and warranties were made at the Closing." That agreement further stated that there "shall not have occurred any material adverse change in [Chemtech's] business or the value of the Shares as of the time of the Closing."

Martin insisted upon these comprehensive representations and warranties prior to signing the contracts. The transaction teetered on the brink when Eastman and Harlan hesitated to include the language requested by Martin, and Martin in fact accepted the Kerry position in part because of this reluctance.

Martin filed a petition alleging fraud on December 1, 2011. The case proceeded to a bench trial November 4–6, 2013. Both parties submitted post-trial briefing to the district court.

On January 17, 2014, the district court issued its findings of fact, conclusions of law, and judgment entry. The court found the defendants had

committed fraud and entered judgment for Martin in the amount of $212,340. Chemtech and Eastman appeal.

## II. Standard of Review.

"We review the judgment of the district court following a bench trial in a law action for correction of errors at law." *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). The district court's findings of fact have the force of a special verdict and are binding on us if they are supported by substantial evidence. *Id.* "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *Id.*

## III. Discussion.

### A. Preservation of Error.

The defendants contend the non-reliance provisions contained in three separate agreements signed by Martin bar his claim of fraud. Alternatively, the defendants contend that if we find the defendants committed fraud, the fact that Martin was aware of the issues when he entered into the second purchase agreement precludes him from availing himself of remedies for fraud. In response, Martin maintains that neither of these claims is preserved for our review.

In their January 6, 2012 answer, the defendants pled affirmative defenses of failure to state a claim upon which relief may be granted and waiver. However, the defendants failed to argue these defenses in their post-trial

briefing.[2]  In its January 17, 2014 ruling, the district court explicitly found the failure to argue or brief the defenses constituted waiver of the defenses.  The defendants did not file a rule 1.904 motion to amend or enlarge.  Thus, we will not consider either claim on appeal.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal . . . .  When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal.").[3]

Additionally, even if the defendants' claim regarding the non-reliance provision was preserved, "[u]nder Iowa law, contractual disclaimers are ineffective to bar a plaintiff from asserting a claim for fraudulent inducement." *Northwest Bank & Trust Co. v. First Illinois Nat'l Bank*, 354 F.3d 721, 726 (8th Cir. 2003) (citing *Hall v. Crow*, 34 N.W.2d 195, 199 (Iowa 1948) ("[W]here there is evidence of fraudulent misrepresentations in the inception of a contract[,] such misrepresentations can be the basis for either an action to rescind or for damages, despite the limiting provisions of a contract.")).[4]

---

[2] The defendants did reference the non-reliance provision in their post-trial brief, but only in passing and only in the context of the justifiable reliance element of the fraud claim.

[3] At oral argument, the defendants maintained they have preserved these arguments because they raised them in a summary judgment motion and then expressly incorporated those arguments in their post-trial briefing.  The record reflects the defendants raised the issue of whether the non-reliance provision barred Martin's fraud claim as a matter of law in the motion for summary judgment and stated they were incorporating the argument in their post-trial brief.  However, the district court ruled the argument was not preserved, and, as noted above, the defendants failed to file a rule 1.904 motion to amend or enlarge.

[4] The defendants urge us to rely on Delaware case law to enforce the non-reliance provision, but we are bound by the decisions of the Iowa Supreme Court.  *See State v.*

**B. Fraud Claim.**

The defendants maintain the evidence in the record does not support a finding of fraud as a matter of law.

In order to prevail on a common law claim, the plaintiff must prove the following: (1) The defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in justifiable reliance on the truth of the representation, (7) the representation was a proximate cause of the plaintiff's damages, and (8) the amount of damages. *Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012). All the elements must be established by a preponderance of the evidence that is "clear, satisfactory, and convincing." *Holliday v. Rain & Hail, L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004). "'Clear and satisfactory' refers to the *character or nature of the evidence*, whereas 'preponderance' of the evidence is a *quantitative* measure." *Id.*

*1. Representations.* The defendants maintain financial projections are "opinions of possible future performance and cannot constitute representations actionable as fraud." However, "[w]hen the statements become representations of fact, or the expression of opinion is insincere and made to deceive or mislead they may be treated as fraudulent. Whether such is their quality and character is ordinarily a jury question." *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 340 (Iowa 1991). This case was tried to the bench rather than a

---

*Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

jury, and the district court was responsible for all findings of credibility and fact.

In its ruling, the court explicitly found:

> Credibility assessments are implicit in these findings. Generally Martin was a more credible witness, particularly when describing his conversations with Eastman and the course of negotiations. At trial, Martin presented as thoughtful, honest, and responsive. Thought Eastman is likely a good accountant and businessman, at trial he tended to be less responsive and more evasive than Martin. In his dealings with Martin, Eastman was essentially a salesman trying to close the deal. And he seemed to assume a similar role at trial.

Additionally, the court found:

> [T]he 2011 projections were conveyed by [the defendants] to Martin as conservative estimates of attainable financial goals based upon facts and circumstances then known to [the defendants]. Specifically, the representation that revenues from sales of NMP and other chemicals could, based upon existing circumstances and conservatively estimated, approach $4 million in 2011 was false.

The projections made by the defendants, even if opinions of future business, were based on representations concerning Chemtech's current clients and the price being paid for NMP, neither of which were accurately conveyed. In 2010, the sale of NMP accounted for over thirty-five percent of Chemtech's total revenue. The three largest customers, Southwest Iowa Egg, Sunbest, and SunRise, were responsible for most of Chemtech's NMP sales, generating approximately $980,000 of Chemtech's $2.2 million in revenue. However, Southwest Iowa Egg had stopped purchasing substantial product from Chemtech in August 2010, Sunbest had stopped in February 2011, and SunRise Farms had stopped in April 2011. These lost customers were not reflected in the projections provided to Martin. Additionally, Chemtech's price for NMP tripled in early 2011 when Chemtech switched distributors.

***2. Falsity of representations and nondisclosure.*** The district court concluded that concealment of a fact may constitute a representation. The defendants dispute the finding and maintain they had no duty to disclose. The defendants also maintain the district court utilized the wrong standard when determining whether the representations made to Martin were false.

Under Iowa law, "failure to disclose material information can constitute fraud *if* the concealment is made by a party under duty to communicate the concealed fact." *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (internal quotation marks omitted). Here, Martin negotiated to have the following language included in the stock purchase agreement:

> No representation or warranty of Company in this Agreement and no statement in any instrument, certificate or other document Company or either of Shareholders delivers to Purchaser in connection with the transactions contemplated by this Agreement does or will omit to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, misleading. There is no fact known to Company or either of Shareholders that has specific application to either Company or its business [other than general economic or industry conditions] and that has a material adverse effect on the assets, business, prospects, financial condition, or results of operations of Company that has not been set forth in the Agreement or disclosed in writing to Purchaser.

Additionally, "[w]e recognize a disclosure obligation can be triggered when a party to a business transaction makes a partial or ambiguous statement of the facts. In that circumstance, other matters may need to be said to prevent the statement from being misleading." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Olson*, 807 N.W.2d 268, 281 (Iowa 2011) (citing Restatement (Second) of Torts § 551.(2)(b) (1976)).

The defendants provided Martin with projections that failed to take into account the known facts that the cost of NMP in 2011 was three times the amount it cost in 2010 and the three largest customers had stopped making substantial purchases from Chemtech. They did not correct these representations or convey that the projection was based on old information. They also failed to disclose ongoing issues with the inconsistency of NMP's performance. While they accounted for the commissions due to their salespeople, they did not convey the nature of the debt to Martin.[5]

**3. Knowledge of falsity and intent to deceive.** The defendants maintain the district court erred in finding they had an intent to deceive because "[n]owhere in the record is there affirmative proof." However, "an intent to defraud may properly be inferred from circumstances, words, and actions shown in evidence." *Wilden Clinic, Inc. v. Des Moines*, 229 N.W.2d 286, 292 (Iowa 1975).

Knowledge of falsity and intent to deceive are closely related. They "are shown not only when the speaker has actual knowledge of the falsity of his representations but also when he speaks in reckless disregard of whether his representations are true or false." *Grefe v. Ross*, 231 N.W.2d 863, 867 (Iowa 1975). Chemtech had changed suppliers for NMP in January 2011, resulting in NMP tripling in price. Additionally, Southwest Iowa Egg had stopped purchasing

---

[5] Two different versions of balance sheets were admitted into evidence at trial. According to Eastman's testimony, on the sheet provided to Martin in April 2011, the commissions owed to personnel were netted against client advances. Similarly, he testified the later version of the balance sheet had the commissions included under accrued expenses. However, the nature of the debt—that it was money owed to sales personnel for back commissions—was not clearly disclosed on either sheet.

substantial product from Chemtech in August 2010, Sunbest had stopped in February 2011, and SunRise Farms had stopped in April 2011—well before Martin signed the performance agreement on May 23, 2011. Although Eastman was aware of the inconsistency of NMP, the loss of business from the three largest customers, and the increased cost of NMP, Eastman still conveyed to Martin that they "conservatively" expected sales to reach $4 million in 2011— approximately $1.8 million more than their 2010 sales. At the very least, Eastman acted with reckless disregard of whether his representations were true. *See McGough v. Gabus*, 526 N.W.2d 328, 332 (Iowa 1995) (concluding a jury could find the defendant had recklessly disregarded the truth where he overvalued the worth of the business in spite of a "substantially lower" appraisal).

**4. Justifiable reliance.** The defendants rely on a contract provision, which states, "[Martin] is making this investment based solely on his own analysis and investigation and not upon any representation, warranty, or guarantee of the Company or its current shareholders," for the proposition that Martin's reliance was unjustified. On the other hand, Martin took a different job and walked away from Chemtech until Eastman and Harlan agreed to include a disclosure obligation in the purchase agreement. When deciding whether someone has justifiably relied on the representations made to them, we consider the following factors:

> (1) the sophistication and expertise of the plaintiff in financial . . . matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the . . . transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009). "[W]e require reliance on the representation to be justified, not reasonable." *Id.* This standard "does not mean a plaintiff can blindly rely on a representation." *Id.* at 738. "Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance has been met." *Id.* "Examples of misrepresentations that may not be justifiably relied upon include situations where a plaintiff has equal knowledge or situations where falsity can be discovered by a cursory examination." *Hammes v. JCLB Props., LLC.*, 764 N.W.2d 552, 556 (Iowa Ct. App. 2008).

Here, it is undisputed that Eastman initially approached Martin about investing in Chemtech and continued to aggressively pursue him. At the time, Martin was well-educated and possessed substantial business experience. However, as the district court acknowledged, "[H]e had never before invested in a small, privately held company, had minimal accounting experience, and most importantly had no knowledge concerning Chemtech's specific business or its operations." Martin had access to Chemtech's employees and records before signing the purchase agreement. However, Eastman was the "point man" for Martin during the due diligence period and provided specific information to Martin regarding the financial condition of the company as well as the current customers. Additionally, Eastman concealed the increased price of NMP and ongoing performance issues with the product. Martin engaged outside

professionals to analyze and investigate the business opportunity. However, he relied on the information Eastman provided him in doing so.

There was not a fiduciary, long-standing business, or personal relationship between Martin and the defendants. Additionally, Martin apparently had access to some of the relevant information, although, as the district court recognized, Martin had access only "to the extent other Chemtech employees would have responded truthfully and completely if asked the right questions." While these factors could favor a finding that the reliance was unjustified, "the scale is tipped in one direction or the other only by a balance of all of the factors." *Spreitzer*, 779 N.W.2d at 738. Here, we find, as did the district court, that the factors balance in favor of a finding of justifiable reliance. Martin may reasonably be expected to ascertain the glowing reports were overly optimistic. However, the defendants had key information—the recent loss of major customers, recent and substantial increase in the cost of the product, and complaints about the performance of the product. Information that a cursory examination would not disclose. Martin did not have experience in this line of business nor could he be expected to ascertain or perceive the information not being disclosed to him.

**5. Cause of damages.** The district court awarded Martin $212,340 in compensatory damages. The court declined to award punitive damages. The defendants do not dispute the way the court determined the award of damages. Rather, they maintain substantial evidence in the record does not support the district court's determination that the defendants' actions were the cause of Martin's purported damages. Specifically, the defendants maintain substantial

evidence does not support the district court's findings that Martin would have taken the job with Kerry and moved his family to Wisconsin.

We believe substantial evidence in the record does support the district court's finding that Martin would have accepted the Kerry job. Martin had already accepted the Kerry job when his contract negotiations fell through with Chemtech. Martin testified that he intended to begin working for Kerry while his family remained in Ankeny due to his children's activities. He would be allowed to work from Ankeny part-time and in Kerry's Wisconsin office the rest of the time. His family was not expected to move to Wisconsin until the following school year. Even if Martin used the Kerry job as leverage, we are convinced, as was the district court, that Martin would have taken the Kerry position if he had been given accurate information about Chemtech.

The terms of the Kerry employment were summarized in an April 14, 2011 letter to Martin. They stated Martin would be paid $165,000 per year, with a $10,000 "sign-on" bonus, and the potential for a thirty-five percent annual bonus, pro-rated for 2011.

A plaintiff cannot recover from fraud if the fact or damage is speculative or uncertain, but a plaintiff is entitled to recover if damage has been proven, although the amount is speculative. *Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 567 (Iowa 1987). "So long as there is a reasonable basis in the record from which the amount of damages can be inferred or approximated, recovery will be allowed." *Id.* Future income is somewhat speculative in nature, especially when considering at-will employment, as Martin accepted at Kerry. *See Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 288 (Iowa 1998).

(concluding a trial court has considerable discretion in determining whether to submit lost income as a damage item to a jury). In *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 312–13 (Iowa 1998), our supreme court explained its decision in *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 688 (Iowa 1990), addressing future-income damages:

> In *Smith* we reversed a trial court's refusal to submit future damages. We recognized that such damages in an at-will employment are somewhat speculative because "it is often difficult, if not impossible, to know how long the employee would have continued to work for the employer." Nevertheless, we remanded on the question of lost future wages. We held that the plaintiff would be entitled to such damages "if the jury concludes from the evidence [the plaintiff] would have been employed by [the defendant] subsequent to the date of trial had it not been for the workers' compensation claim." We then went on to say "[t]he jury must then determine the likely duration of [the plaintiff's] employment [with the defendant]." The difference between the plaintiff's wages with the defendant-employer and the present employer reduced to present value would be the amount of the award.

(Internal citations omitted.)

The district court awarded Martin $212,340 in damages. The court awarded the sum of twelve-months salary, the ten percent "sign-on" bonus, and $37,340 for the prorated 35% bonus for 2011.[6] The district court denied Martin's claim for the amount he paid his attorney and accountant because "the evidence does not support the conclusion that these expenses were caused in substantial part by Defendants' fraud." The court also denied Martin's claim for punitive damages.

---

[6] Martin testified at trial that Kerry had in fact met its sales goals and had paid out the bonus to its employees in 2011.

While the amount of damages was somewhat speculative in nature, we cannot say the district court abused its considerable discretion. Here, Martin had accepted the employment with Kerry, and the district court reasonably limited the loss of income to twelve months plus the sign-on bonus and a pro-rated portion of the thirty-five percent bonus.

**IV. Conclusion.**

Because we find substantial evidence in the record supports the district court's finding of facts, and the facts support the district court's judgment in favor of Martin in the fraud action, we affirm the judgment and the damages awarded.

**AFFIRMED.**