# IN THE SUPREME COURT OF IOWA

No. 11–1280

Filed December 9, 2011

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

Complainant,

vs.

**STEVEN F. OLSON,**

Respondent.

_____

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

The Grievance Commission of the Supreme Court of Iowa recommends the respondent be ordered to cease and desist from practicing law in Iowa for thirty days. **COMPLAINT DISMISSED**.

Charles L. Harrington and Amanda K. Robinson, Des Moines, for complainant.

Steven F. Olson, Bloomington, Minnesota, pro se.

**MANSFIELD, Justice**.

This attorney disciplinary proceeding comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa. *See* Iowa Ct. R. 35.10(1). The Iowa Supreme Court Attorney Disciplinary Board alleged the respondent, Steven F. Olson, violated ethical rules by communicating directly with a represented party, making misrepresentations of fact to that party, and engaging in fraud and deceit toward that party. The commission found two of the alleged violations had occurred and recommended Olson be ordered to cease and desist from the practice of law in Iowa for thirty days. Upon our consideration of the commission's findings of fact, conclusions of law, and recommendations, we are unable to conclude by a convincing preponderance of the evidence that Olson committed any of the alleged violations. Therefore, we dismiss the complaint.

## I. Factual and Procedural Background.

Olson is a member of the Minnesota and South Dakota bars. His offices are located in Minnesota. Olson also is admitted to practice in the tribal courts of the Sac & Fox Tribe of the Mississippi (the Tribe). His law firm regularly represents the Tribe. Olson is not a member of the Iowa bar.

DNA Today, LLC is a now-defunct software company that was formerly based in West Des Moines. The company offered software that potentially could be used to store information about a person's ancestry and verify whether that person was a bona fide member of an Indian tribe. At some point in 2005, DNA Today approached the Tribe about its software. Eventually the parties agreed the Tribe would provide funding to the company.

In July 2005, the Tribe loaned one million dollars to DNA Today secured by "all assets of the Company," including "source code or similar software." Steven Whitehead, the President of DNA Today, personally guaranteed repayment of the one million dollar debt.

The debenture agreement also contained terms under which the Tribe could convert its debt interest into stock. Additionally, the agreement required DNA Today to keep the collateral free and clear of any other security interests. The agreement was governed by the laws of the Tribe and deemed to have been executed on Indian lands.

The agreement was prepared by Olson and negotiated between Olson and Whitehead. Olson and Whitehead continued to deal directly with each other after that.

Under the terms of the debenture agreement, DNA Today was required to pay interest to the Tribe of $25,000 per quarter and to repay the one million dollars in principal on the one-year anniversary of signing—i.e., July 2006. By the fall of 2005, however, DNA Today was in default with the Tribe. DNA Today was actively searching for other investors. One possible deal that would have required the Tribe to subordinate its debt fell through in the spring of 2006.

In or about March 2006, without notifying the Tribe, DNA Today took out a $200,000 secured line of credit with a commercial bank. This was in violation of the debenture agreement, which prohibited DNA Today from encumbering its assets with other security interests.

In late May 2006, DNA Today signed an agreement to retain Windstone Capital of Scottsdale, Arizona as a broker to use its best efforts to raise $5 million in outside capital for the company. The agreement required a $25,000 cash retainer with $15,000 due upon signature and the remaining $10,000 payable in thirty days. DNA Today

paid the initial $15,000, but was unable to pay the remaining $10,000 of Windstone's retainer.[1]

Meanwhile, DNA Today was not compensating its team of computer programmers, who were located in France. As a result, they had ceased working for the company. By July 2006, DNA Today was in a very precarious financial position. As Whitehead explained to Olson in an e-mail:

> [W]e are in need of immediate relief if we are to stabilize the company to insure that we will be operational over the next several months. . . .
>
> . . . .
>
> . . . We are at a serious crossroads that not only [a]ffects us, bu[t] the tribe as well. . . .
>
> . . . .
>
> The biggest risk is holding our team, including the technical team, together. The[] guys in France are refusing to provide services for us until they get paid. This will be a very big problem if it goes on much longer. Our staff has forfeited pay for many pay periods, but can no longer afford to do so. We are at partial staffing as a result, which is also dangerous.
>
> I urge [you] to review this situation with full and deep consideration. With the tribe's support, we can make it through and should be in great shape to cash in on the market that is so strong for us. Without any support, the tribe's investment and our company are in serious jeopardy—and I mean serious. This is not a scare tactic, it is reality.

Whitehead's e-mail included suggestions of how the Tribe might provide additional funding to DNA Today.

On July 11, 2006, a meeting took place between DNA Today and the Tribe. No attorneys were present. On July 25, 2006, Olson faxed a

---

[1]In his complaint against Olson, Whitehead referred to Windstone as a "new investor." The record clearly indicates that Windstone was not an investor, but rather, a broker for potential investments.

letter on behalf of the Tribe to Whitehead regarding another potential business meeting to occur on July 26. The July 26 meeting took place, again without attorneys present.

On July 27, 2006, according to Whitehead's later explanation to his investors, Whitehead called Olson to find out what the Tribe planned to do. Olson returned the call on July 28. In that call, Whitehead warned Olson that "our business was in serious jeopardy of shutting down and that we would likely lose the Windstone deal, which would mean that the tribe would never get their money back for the debenture." In the mean time, Whitehead contacted Windstone and obtained yet another extension of the deadline to pay the remaining $10,000 of the broker fee.

Olson recalled these events similarly. As Olson explained:

He [Whitehead] came to the Tribe in July—in late June, early in July, and explained that he was completely out of money and that he was going to have to close the doors unless the Tribe loaned him some additional money.

Well, the Tribe didn't do anything for an extended period of time. I don't know if any of you have ever dealt with Indian tribes, but I suspect you—some of you have dealt with governing bodies, political entities. And a tribal council is like any political entity, it makes decisions very slowly, and perhaps even more slowly than most traditional governing bodies that we're accustomed to dealing with in the non-Indian world.

And as a consequence of that delay he [Whitehead] was at the point by the end of July where he was in default with the Tribe, but he also owed virtually every other creditor, according to what he was telling the Tribe at the time. He really had no other resources, and he had no other direction to go because he didn't have the $25,000 in the business coffers that it would take to get this broker, the Windstone broker that he talked about when he was here, to put together a deal that could then go out and be marketed to potential investors. As he indicated, this was an investment broker; this was not a venture capital firm, this was not any kind of a firm that had a banking firm or that had actual resources.

Around this time, Olson learned DNA Today had taken out the $200,000 secured line of credit several months before in violation of the parties' debenture agreement. On August 2, 2006, Olson filed a UCC financing statement with the Iowa Secretary of State regarding DNA Today's assets, including the software source code.

On August 7, 2006, Olson filed a complaint in tribal court against DNA Today and Whitehead alleging default under the loan and security agreement and seeking damages and an injunction. The injunction would prohibit the defendants from disposing of or interfering with any effort by the Tribe to take possession of the Tribe's collateral. On August 8, 2006, the tribal court issued a temporary restraining order, which Olson did not immediately serve on DNA Today.

During the month of July, when discussions began about the Tribe possibly providing additional funding to DNA Today, Olson for the first time had direct contact with Frank Carroll of the Davis Brown law firm. Olson recalled receiving a phone call from Carroll and being told by Carroll that he represented DNA Today for purposes of negotiating the new agreement, but not with respect to the existing financing. Carroll testified he did not recall placing any limitations with Olson on his representation of DNA Today. In any event, Whitehead and Olson continued to correspond with each other directly on matters other than the potential new agreement, while copying Carroll on their communications.

Notably, Whitehead's recollection on this subject was not far from Olson's. Whitehead testified that the Davis Brown firm was fine with his contacting Olson directly so long as it was for informational purposes as opposed to negotiations for contracting or legal issues.

Between August 7 and August 9, 2006, drafts of a "Collateral Agreement" were exchanged between the Davis Brown law firm and Olson. Frank Carroll was away from the office, so Julie McLean Johnson and Jason Stone of the same law firm communicated with Olson. The gist of the negotiations was that the Tribe would provide some additional funds and DNA Today would deposit a copy of the software source code. The parties did not come to an agreement, however. Among other things, DNA Today objected to giving the Tribe a copy of the source code as the Tribe had requested, instead preferring to have the code deposited with a third-party escrow agent. The amount of funding also was in dispute. DNA Today sought $30,000 to $50,000 in immediate cash and a commitment from the Tribe to provide an additional $500,000 in financing. The Tribe, on the other hand, was willing in its proposals to advance only the $10,000 required by Windstone.

Around midday on August 9, after receiving Olson's latest version of the agreement from Davis Brown, Whitehead wrote his stockholders that the Tribe had "rejected every key point that we proposed." With regard to the interim financing, Whitehead added, "[The Tribe] are telling us verbally that they are going to do it, but won't put it in writing. Why?"[2]

On August 10, 2006, at 12:20 p.m., phone records show that Olson had a one-minute call with Jason Stone, one of DNA Today's attorneys. Olson claims that Stone authorized him in that call to communicate directly with DNA Today. Stone did not recall such a conversation but testified that, if it had occurred, he thinks he would have remembered it. Stone also did not think that, under the

---

[2]Olson testified that he did not believe negotiations had ended and was awaiting a response to his latest proposal relating to the $10,000.

circumstances, he would have given Olson permission to talk directly to his client.

Late that afternoon, Olson spoke directly with Whitehead. Whitehead recalls Olson telling him the Tribe was no longer interested in taking possession of the software code, but "had agreed to making the payments of the funds and had agreed in principle to providing us with the bridge financing." As Whitehead remembers, Olson also asked Whitehead if the Tribe could have a couple of its members visit DNA Today's offices the next morning to verify the software was there. Whitehead recalls being told that Janice Eagle Hawk and a "Rich" or "Mike" were the persons who would be coming. Following the call, Whitehead e-mailed Stone:

> We won. The tribe gave in and has agreed to work with us on the finances. We played hardball with them and won. Olson called me today to confirm their interest in moving forward without us giving them the code. A big victory for our team. Now we should be able to move ahead freely and light things up.

Olson denied making any assurances regarding financing to Whitehead. According to Olson, he called Stone first about scheduling a meeting to look at the software. Stone told him to talk to Whitehead. Olson claims he then spoke with Whitehead, but only about examining the software. Olson said he advised Whitehead that Janice Eagle Hawk and J.R. would be the two persons coming to DNA Today's offices. Olson testified that the Tribe wanted to see the software because it had received a back-channel communication from the head of the programming team that the complete software was not in West Des Moines.

After receiving Whitehead's e-mail reporting on the conversation with Olson, Stone responded to Whitehead with his own e-mail:

> Just make sure that you secure the source code tomorrow and take steps to ensure that the Tribe cannot easily obtain a copy of it while they are there. Also, you should make sure that you have a copy. I have no reason to believe that there will be any issues associated with their trip, but it will not hurt to be a bit cautious.

Whitehead replied to his counsel early the morning of August 11 that he would "keep my eye on them today." He also explained that the company had two copies of the software and that the software had certain security features preventing outsiders from accessing, editing, or downloading it even if they obtained a copy of it.[3]

At around 9 a.m. that morning, two persons arrived at DNA Today's offices. One was tribe member Janice Eagle Hawk; the other was Olson's law partner J.R. According to Whitehead, J.R. "mumbled" his name and did not provide any card or type of identification. Whitehead recalls that J.R. looked disheveled. The meeting began in a meeting room where a terminal was set up to show off the software. To Whitehead's surprise, Eagle Hawk had a portable hard drive in her possession.

At some point, J.R. became more agitated and started pacing the room. He asked where the server was. When shown to the server, J.R. disconnected it and said, "I'm taking it. It belongs to us. It's ours." J.R. walked out the door, and Eagle Hawk followed shortly thereafter. Whitehead called the police and also pursued J.R. outside as he put the server in the trunk of his car.

About ten minutes after J.R. left, a man identifying himself as the police chief of the Tribe appeared at the offices. According to Whitehead, he said, "I'm really sorry. We should have given you these papers before;

---

[3]Although these e-mails reflecting communications between DNA Today and its counsel were admitted into evidence, DNA Today generally declined to waive the privilege with respect to its communications with the Davis Brown law firm.

we're just a little late. But here, here are the papers that explain what just happened."[4]

Whitehead testified that the server was a leased server, not actually owned by DNA Today, and that data stored on the server included confidential information relating to numerous individuals.

An information technology consultant retained by DNA Today, Alex Romp, also was present when Eagle Hawk and J.R. came to the offices on the 11th. He testified that the source code at DNA Today was an older version. According to Romp, his understanding from Whitehead was that the Tribe's representatives were coming just to examine the source code. Romp's memory of what happened on the 11th generally corresponded to Whitehead's; however, Romp added that Eagle Hawk seemed genuinely surprised by the entire series of events.

Whitehead wrote Olson on August 16, stating, "We strenuously object to your patently dishonest, highly unethical tactics concerning the seizure of one of our servers." Whitehead's position, as stated in the letter, was that Olson had lied to him on August 10 about the status of negotiations and the purpose of the next day's meeting, in order to obtain access to the premises so the Tribe could repossess the server. Whitehead added, "You knew full well that we were represented by [counsel] during this process and you chose to ignore them and not involve them in this process."

In his hearing testimony, Olson denied knowing beforehand that J.R. would try to take possession of the software on the morning of the 11th. Olson acknowledged that repossession was an option if

---

[4]Whitehead testified that, if the Tribe's process-server had arrived while the server was still there, he would have called the Davis Brown law firm and asked for their advice.

negotiations broke down; that is why the Tribe had obtained an order from the tribal court. However, Olson said that his preference would have been to work with DNA Today. In Olson's view, it made no sense to foreclose since that would put DNA Today out of business without retiring its financial obligation to the Tribe. Olson testified he had told Stone either on the 10th or earlier that the purpose of the Tribe's visit on the 11th would be to verify the company had a complete copy of the source code that could be downloaded.[5] According to Olson, his concern was that the French programmers actually owned the code and that the Tribe did not have a complete or current version. In fact, Olson testified he later learned that DNA Today did not own the code after all; the programmers did.

Olson claimed he was "shocked" when he found out J.R. had taken the server at the meeting on the 11th. Olson explained that he had been in Minnesota while J.R. had been at the Tribe settlement during the days leading up to the 11th and he had not been in touch with J.R.. As he put it, "Unfortunately, at some point after [J.R.] was at the settlement, plans must have changed. I was not brought into the loop on that at all."

Olson also testified that as an attorney he would never go to repossess something. "That's not my role as an attorney." He acknowledged the possibility of repossession had been discussed. He said he was aware the Tribe believed it needed to look at the source code before it went any further.

According to Olson's hearing testimony, J.R. disclosed to him only *afterward* that the Tribe had made a firm decision they would come away from the August 11 meeting with a copy of the code. Olson contends he

---

[5]Olson's phone records show a two-minute call with Stone late on the afternoon of the 9th, in addition to the one-minute call on the 10th.

was later told by J.R. that J.R. made an on-the-spot decision to take the server when it appeared this was the only way the Tribe would be able to obtain the code.

Olson acknowledged that, in an initial joint response to the Board in September 2006, he and J.R. wrote "it was nearly certain" the Tribe would need to repossess the source code on the 11th. Additionally, in that response, he and J.R. wrote they had conferred together *before* the August 11 trip to DNA Today and decided not to disclose "the second purpose of the visit," i.e., to repossess the source code if DNA Today would not provide a copy voluntarily.

In an effort to reconcile his hearing testimony with the September 2006 letter, Olson explained the response to the Board "was a combined response that really presented the perspective of the two of us, and that perspective is not entirely all mine." Olson testified it was not his understanding the source code was going to be repossessed, although it may have been J.R.'s.

Olson was not questioned at the hearing about his written response in October 2006 to the Minnesota Office of Lawyers Professional Responsibility.[6] He alone signed that response. In that response, Olson reiterated that it was "virtually certain" the source code would need to be repossessed by the time of the meeting and that he and J.R. had conferred and concluded ahead of time they did not need to disclose the Tribe's intent to repossess the source code if DNA Today could not or would not provide a copy.

---

[6]A parallel complaint filed by Whitehead against Olson with the Minnesota Office of Lawyers Professional Responsibility was denied by that agency.

## II. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Fields*, 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission's findings and recommendations, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 864 (Iowa 2010). "The board has the burden of proving attorney misconduct by a convincing preponderance of the evidence." *Id.*

## III. Review of Alleged Ethical Violations.

In its complaint, the board alleged that Olson violated Iowa Rules of Professional Conduct 32:4.2(a) by communicating with Whitehead on August 10 without Stone's consent, violated rule 32:4.1(a) by misrepresenting to Whitehead that the Tribe was no longer insisting on a copy of the software source code and had agreed to provide supplemental financing as requested by the company, and violated rule 32:8.4(c) by engaging in deceptive conduct with Whitehead.[7]

---

[7]Other allegations were dismissed by the commission before the hearing. The commission also denied Olson's motion to dismiss based on lack of personal jurisdiction. We agree with that ruling. Rule 32:8.5(a) provides in part:

> A lawyer not admitted in Iowa is also subject to the disciplinary authority of Iowa if the lawyer provides or offers to provide any legal services in Iowa. A lawyer may be subject to the disciplinary authority of both Iowa and another jurisdiction for the same conduct.

Iowa R. of Prof'l Conduct 32:8.5(a).

"Our jurisdiction to discipline attorneys practicing in Iowa under rule 32:5.5(d)(2) rests on our responsibility to protect the citizens of our state from unethical conduct of attorneys who provide services in Iowa." *Iowa Supreme Court Att'y Disciplinary Bd. v. Carpenter*, 781 N.W.2d 263, 267 (Iowa 2010). As noted by the commission, this case centers on Olson's communications with an Iowa resident who was in Iowa at the time of the communications and was the head of an Iowa-based company. The purpose of the communications was to enable Olson's client to visit the Iowa offices of that company and to obtain a copy of the source code. As a precursor to those communications, Olson caused a UCC financing statement to be filed with the Iowa Secretary of State. *See In re Tonwe*, 929 A.2d 774, 778 (Del. 2007) (stating that "physical presence is not required to establish that a person is providing, or offering to provide, legal services in this state").

In a thorough decision that followed a full-day hearing on June 2, 2011, the commission found that Olson did not have express or implied permission to contact Whitehead directly and thus violated rule 32:4.2(a). The commission did not find a violation of rule 32:4.1(a) because it deemed the evidence of intentional misrepresentation insufficient. However, the commission found a violation of rule 32:8.4(c), stating that Olson should have communicated "[t]he material fact . . . to Whitehead . . . that the Tribe had the 'alternative plan' to repossess the source code at the meeting." The commission recommended an order prohibiting Olson from practicing law in Iowa for thirty days.[8]

We now review the commission's findings, conclusions, and recommendations. Unlike in many disciplinary cases, we do not have to examine a long sequence of alleged ethical shortcomings. Instead, our attention is squarely focused on the phone calls Olson had with Stone and Whitehead just before the August 11 meeting at which J.R. removed the server from the DNA Today offices. Whitehead claims he was tricked by Olson over the phone into agreeing to that meeting. Olson maintains that he did not mislead Whitehead and that the meeting turned out differently than he had anticipated.

Some legal background is important. It is undisputed that DNA Today was in default and that the Tribe had the right to take possession of the source code as collateral. *See* Iowa Code § 554.9609(1)(*a*) (2005) (providing that "[a]fter default, a secured party . . . may take possession of the collateral"). This repossession can be carried out "without judicial process, if it proceeds without breach of the peace." *Id.* § 554.9609(2)(*b*).

---

[8]As noted above, Olson is not admitted to practice law in Iowa. Thus, after concluding a thirty-day suspension of Olson's license otherwise would have been the appropriate sanction, the commission properly recommended an equivalent sanction that invoked our equitable powers. *See Carpenter*, 781 N.W.2d at 269–70.

**A. Alleged Violation of Rule 32:4.2(a).** Rule 32:4.2(a) provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Iowa R. Prof'l Conduct 32:4.2(a). This rule is designed to "protect[] the represented party from the imbalance of legal skill and acumen between the lawyer and that party." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schmidt*, 796 N.W.2d 33, 40 (Iowa 2011). It also "promotes the integrity of the attorney-client relationship and serves to prevent a variety of overreaching." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Herrera,* 626 N.W.2d 107, 113–14 (Iowa 2001) (equating rule 32:4.2(a) with its predecessor Iowa Code of Prof'l Responsibility DR 7–104(A)(1)). We have interpreted this rule to "prohibit an attorney from communicating with an adverse party represented by counsel concerning litigation or a transactional matter unless the attorney for the adverse party gives the opposing attorney permission to talk to the adverse party." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gailey,* 790 N.W.2d 801, 806 (Iowa 2010) (equating rule 32:4.2(a) with its predecessor Iowa Code of Prof'l Responsibility DR 7–104(A)(1)).

As we have set forth above, Olson contends he received permission from Stone on August 10 to speak directly to Whitehead. Stone does not recall the phone call, but does not believe he gave Olson permission. The phone records show there was a call, but it only lasted one minute or less.

The commission concluded on this record that Olson did not receive permission and most likely reached Stone's voicemail. As the commission put it, "In this era of email, we would expect an email

confirming this express permission, especially considering the email exchanges of the previous three days."

We believe the commission overlooked some key points in the record. First, and most importantly, late in the day on August 10, Whitehead e-mailed Stone and said, among other things, "Olson called me today to confirm their interest in moving forward without us giving them the code." If Stone had *not* given Whitehead permission to talk to his client directly, one would have expected Stone to take some action—e.g., call Olson immediately. Instead, Stone responded to Whitehead with various advice about the next day's meeting, telling him to "secure the source code tomorrow" and "make sure that you have a copy."

Furthermore, when asked at the hearing whether his attorneys were "fine with you contacting Mr. Olson directly," Whitehead answered, "As long as there weren't, you know, negotiations for contracting or legal issues going on. For informational purposes they were fine with that." Thus, while Carroll and Stone had no recollection of giving Olson permission to communicate directly with Whitehead, Whitehead *did* have a recollection that such permission had been given, at least on some subjects. Even after the Davis Brown law firm became involved in July 2006, Olson and Whitehead continued to e-mail each other directly, except with respect to the text of the proposed Collateral Agreement. After consulting with his attorneys regarding the events of August 11, Whitehead again wrote Olson directly on August 16, while only sending an informational copy to Carroll. Against this backdrop, it is understandable that Olson would not have sent a confirming e-mail to Stone on the 10th.

We are unable to find by a convincing preponderance of the evidence that Olson did not have Stone's permission to speak directly with Whitehead on August 10.[9]

**B. Alleged Violation of Rule 32:4.1(a).** Rule 32:4.1(a) states, "In the course of representing a client, a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person[.]" Iowa R. Prof'l Conduct 32:4.1(a).

The Board alleged Olson misrepresented to Whitehead that the Tribe had agreed to provide supplemental financing to DNA Today as requested and was no longer insisting on obtaining a copy of the software source code, but only in verifying that DNA Today had possession of the source code.

The commission concluded the Board had failed to establish these allegations by a convincing preponderance of the evidence. We agree. Regarding the alleged misrepresentation that the Tribe had agreed to provide the supplemental financing requested by Whitehead, it is important to contrast the specific differences that had emerged in the written negotiations with the vagueness of Whitehead's description of the conversation where Olson allegedly made the misrepresentation.

According to the written record, the situation on August 9 was that the Tribe was willing to provide $10,000 whereas DNA Today wanted $30,000 to $50,000 with a commitment for more to follow. Yet Whitehead's e-mail to his attorney Stone on the 10th following the key call from Olson was fairly nonspecific. It said the Tribe "has agreed to

---

[9]After finding that Olson did not have express consent to speak directly with Whitehead, the commission went on to address whether Olson had implied consent. Although the commission's discussion of implied consent is a thorough and thoughtful treatment of the subject, we do not need to reach the issue of implied consent because we disagree with the commission's finding as to express consent.

work with us on the finances." Likewise, in his August 7 communication with his stockholders, Whitehead acknowledged that the "details" as to "how much money they will provide us, what the terms are, when that money will be available etc." were "extremely important." Those important details were missing from Whitehead's e-mail to his attorney after the August 10 call.

Moreover, in his subsequent complaint to the Board, Whitehead said that as of August 10 the "primary issue of the negotiations was collateral." This statement, however, seems inconsistent with the contemporaneous documents, which show the parties well apart on the amount of financing—the issue that one would have expected the company to consider "primary." In short, the paper trail from the relevant time period tends to suggest that Olson communicated at most a general intention to work out a deal, as opposed to a commitment to Whitehead's specific deal. *See id.* r. 32:4.1 cmt. [2] (noting that statements of "a party's intentions as to an acceptable settlement of a claim" are ordinarily not considered statements of fact for purposes of the rule).[10]

By midday August 9, 2006, DNA Today was in desperate straits. Whitehead believed the negotiations with the Tribe were over and his company was potentially headed into oblivion. This makes it plausible that, when Olson called the next day, Whitehead may have optimistically

---

[10]There was a precedent for Whitehead and Olson being crossed in their signals. In his August 7 memo to DNA Today shareholders, Whitehead said Olson had told him on August 3 that the Tribe "had agreed to extend us a line of credit," but "did not give any specific details when asked." When the draft agreement arrived a few days later, it proposed that the Tribe would only pay the $10,000, with no reference to a line of credit. Notwithstanding Whitehead's use of the term "agreed" to characterize Olson's August 3 representations, the circumstances indicate there was never any actual agreement, given Olson's refusal on August 3 to provide "any specific details when asked."

thought he heard more than he actually did hear. Of course, it is also plausible that Olson affirmatively misled Whitehead on the financing. Ultimately, though, we are not persuaded by a convincing preponderance of the evidence that Olson told Whitehead on August 10 the Tribe had agreed to provide the actual supplemental financing requested by DNA Today.[11]

Likewise, we are not persuaded by the required level of proof that Olson told Whitehead on August 10 the Tribe was no longer insisting on obtaining a copy of the software code. In our view, it is quite possible Olson actually said only that the Tribe wanted to examine the software and Whitehead thought he heard an additional statement that the Tribe no longer was interested in getting a copy. As with the other alleged misrepresentation, another possibility is that Olson affirmatively and intentionally misled Whitehead, but we cannot say this occurred with the required degree of confidence.

**C. Alleged Violation of Rule 32:8.4(c).** Rule 32:8.4(c) provides, "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" *Id.* r. 32:8.4(c).

Although the commission did not find that Olson made an affirmative misrepresentation of fact to Whitehead on August 10, it did conclude he had engaged in deceptive conduct within the meaning of rule 32:8.4(c). As the commission explained:

> It is far too convenient for Olson to now state that he was not sure whether [J.R.] would or would not seize the source code the following day at the time he called Whitehead. The material fact that should have been

---

[11]We assume without deciding that such a misrepresentation—i.e., that the Tribe had agreed to DNA Today's specific financing request—would be one of material fact.

communicated to Whitehead is that the Tribe had the 'alternative plan' to repossess the source code at the meeting. Considering the ongoing dispute about even producing a copy of the source code, it is abundantly clear that had Olson informed Whitehead of this plan, Whitehead would not have agreed to the meeting. To us, this demonstrates the artifice that Olson created to let Whitehead's guard down to permit the self-help repossession.

We approach the commission's resolution of this issue with a considerable degree of respect. The commission's written decision reflects careful and balanced deliberation. We agree with the commission that a failure to disclose facts with the intent to deceive can violate rule 32:8.4(c) when there is an underlying duty to disclose. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 726 N.W.2d 397, 406 (Iowa 2007) (holding that an attorney violated former DR 1–102(A)(4), which is worded similarly to rule 32:8.4(c), by placing a lien on his client's property without disclosing this fact to her). Yet we part company from the commission's final conclusion, primarily for legal rather than factual reasons relating to the scope of Olson's disclosure obligation.

Under the law, so long as Olson did not affirmatively mislead Whitehead, *see* 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 34–8, at 446 (6th ed. 2010) ("When creditors enter premises under ruses (I am the piano tuner), and particularly when private parties pose as policemen, they are likely to have broken the peace . . . ."), he had no legal duty to disclose the Tribe's contingent plan to attempt self-help repossession, *see* 10 Ronald A. Anderson *Uniform Commercial Code* § 9–503:156, at 393 (3d ed. rev. 1999) ("The secured creditor may enter the debtor's premises without prior notice in order to repossess the collateral."); *see also Rainwater v. Rx Med. Servs. Corp.*, 30 UCC Rep. Serv. 2d 983 (E.D. Cal. 1995) (finding no breach of the peace

where the plaintiff simply walked into the business premises of her former employer after having been terminated and took certain equipment in which she had a security interest). Self-help is to some extent a rough and tumble world. A commercial debtor that is in default is not entitled to a *Miranda* warning that its collateral may be repossessed if it consents to the creditor's entry on the premises.[12]

In any event, this debtor was not in need of such a warning. Stone told Whitehead on August 10 to "make sure that you secure the source code tomorrow" and, if something happened, to make sure "you have a copy." Whitehead responded that the code had "unique" protections which meant that "nothing can be done with the code as far as getting access to it to edit it or download it" without a smart card and a dongle. Whitehead himself acknowledged to his counsel that he was engaging in "hardball."

The statement that Olson admitted he made, and that we find he made, was that the Tribe wanted to see the source code firsthand. This was a true statement and not just a ruse. Based on conversations with the head of DNA Today's outside programming team, Olson had concerns

---

[12]In some jurisdictions, even a creditor that makes a misrepresentation to enable repossession does not commit a breach of the peace. *See, e.g.*, *K.B. Oil Co. v. Ford Motor Credit Co.*, 811 F.2d 310, 313–14 (6th Cir. 1987) (applying Ohio law and concluding fraudulent misrepresentations to a third party that the debtor had agreed to repossession did not amount to breach of the peace); *Cox v. Galigher Motor Sales Co.*, 213 S.E.2d 475, 479 (W. Va. 1975) (stating that, "although we look with disfavor on the use of deceit, such repossession was achieved without a breach of the peace and was lawful"). *But see Clarin v. Minn. Repossessors, Inc.*, 198 F.3d 661, 664 (8th Cir. 1999) (applying Minnesota law and relying on White & Summers treatise to hold that five factors enter into whether the creditor committed a breach of the peace, including the creditor's use of deception); *Ford Motor Credit Co. v. Byrd*, 351 So.2d 557, 559 (Ala. 1977) (finding the creditor committed a breach of the peace when it tricked the debtor into bringing his car into the dealership under false pretenses). There is no Iowa authority directly on point. Regardless, the key point for present purposes is that a secured creditor does not normally have a duty to tell the defaulting debtor about plans for repossession.

about the integrity of the version of the code in West Des Moines. The concerns turned out to be valid.

We recognize a disclosure obligation can be triggered when a party to a business transaction makes a partial or ambiguous statement of the facts. In that circumstance, other matters may need to be said to prevent the statement from being misleading. *See Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 175 (Iowa 2002); Restatement (Second) of Torts § 551(2)(b) (1976). Olson came close to the edge by telling Whitehead the Tribe wanted to see the source code without also mentioning it planned to come away from the meeting with a copy. But given that the Tribe was genuinely interested in looking at the code (and not *just* in getting a copy), and given Whitehead's and his counsel's appreciation of the risks in letting them into the offices, we cannot say by a convincing preponderance of the evidence that Olson crossed the line here.[13] In short, we cannot conclude Olson violated rule 32:8.4(c) because the commission's analysis, in our view, would impose a duty of disclosure on attorneys that the underlying law does not impose.

With some justification, the commission criticizes Olson for inconsistency in his testimony. As noted by the commission, Olson testified "both that he told Whitehead that the purpose of the visit was merely to confirm that the source code was at DNA Today's offices, and that he told Whitehead that the Tribe 'might make a copy' of it during the August 11 meeting." Initially Olson testified:

> [I said] they were coming there to confirm that he had a complete copy of the source code and that it was downloadable to a device that, where it could be saved as

---

[13]The risk that Whitehead and his counsel did not appreciate was that one of their guests might walk out of the office with DNA Today's computer server. However, we believe J.R.'s decision to walk out with the server was not preplanned and was made on the spur of the moment.

opposed to a copy of the source code that was unique to a single device or a single system, that this was reproducible copy.

Later Olson went on, "[I said] there might be a copy of it made if it was a copy—if it was a source code, a type that could be copied."

We agree with the commission that there is a distinction between telling someone you want to find out if something can be copied and telling someone you actually want a copy. We suspect that Olson only made the former statement. As previously noted, based on Olson's behind-the-scenes conversations with the programmers, one of the Tribe's concerns was that DNA Today did not actually have a version of the software that was capable of being copied or downloaded and the Tribe needed to do a test. Whitehead's private communications with his attorney and his stockholders suggest the Tribe's concern was legitimate and that DNA Today was to some extent playing a cat-and-mouse game with the Tribe. Still, regardless of which of these statements Olson made, it would not be enough in our mind to establish that Olson defrauded DNA Today and Whitehead.

There are also apparent inconsistencies between Olson's 2011 hearing testimony and his September and October 2006 letters to the Iowa and Minnesota disciplinary authorities. In his hearing testimony, Olson claimed he was unaware that the Tribe had made a decision to repossess the software code. In his 2006 letters, on the other hand, Olson said that he and J.R. spoke beforehand and agreed they "did not have to disclose" the Tribe's plan to take possession of the source code if DNA Today did not voluntarily provide a copy. If we were forced to choose, we would probably trust Olson's nearly contemporaneous letters as a more accurate version of events. However, we do not need to choose because under either version of what happened we cannot conclude by a

convincing preponderance of the evidence that Olson engaged in fraudulent or deceitful conduct.[14]

Since the Board's complaint against Olson hinges in large part on Whitehead's credibility, we believe two additional points should be noted. Taken as a whole, Whitehead's writings unrealistically blame the Tribe and Olson for the demise of DNA Today. After all, the Tribe loaned $1 million to DNA Today, something no one else did. The Tribe also did not attempt to collect its debt for approximately nine months after the company went into default. And the Tribe was willing to lend an additional $10,000 after DNA Today's programmers had pulled out and the company had generally stopped paying its bills. Whitehead's blame-shifting to some extent detracts from his credibility, in our view.

Furthermore, Whitehead declined to waive the company's attorney-client privilege at the commission hearing. The reasons for this decision are unclear. DNA Today had ceased operations and entered bankruptcy years before. As a result of this decision, the record includes only a portion of the DNA Today attorney-client communications—those which Whitehead chose to release.

**IV. Conclusion.**

As we have previously observed, this matter requires us to consider what was said or not said in a few oral communications. For the reasons we have discussed, as we reconstruct what happened in those conversations, we are unable to conclude by the required convincing preponderance of the evidence that Olson violated rule 32:4.2(a), rule 32:4.1(a), or rule 32:8.4(c).

---

[14]We are troubled by certain aspects of Olson's hearing testimony. However, given some ambiguities in the record (for example, at times it is unclear whether Olson is referring to the repossession of the server or to the repossession of the source code), and given the fact that J.R. did not testify, we cannot say anything more at this point.

The Board also took exception to a number of Olson's actions in defending this disciplinary proceeding, including motions that he filed. Because these matters are not raised as independent violations, but only as alleged aggravating factors, we do not consider them.

**COMPLAINT DISMISSED.**

All justices concur except Zager, J., who takes no part.