**IN THE COURT OF APPEALS OF IOWA**

No. 13-1777
Filed February 11, 2015


**SENECA WASTE SOLUTIONS, INC.,**
      Plaintiff-Appellant,

**vs.**

**D & K MANAGING CONSULTANTS, LLC d/b/a**
**MOTOR CITY PLANT SERVICES, KEITH**
**KOSKELA, and MPS GROUP, INC.,**
      Defendants-Appellees.
_____


      Appeal from the Iowa District Court for Polk County, Douglas F. Staskal,

Judge.


      A company appeals the district court's ruling following trial. **AFFIRMED IN**

**PART, REVERSED IN PART, AND REMANDED.**


      Brenda L. Myers-Maas of Myers-Maas Law, P.L.C., West Des Moines, for

appellant.

      Brian S. McCormac and Brant D. Kahler of Brown, Winick, Graves, Gross,

Baskerville & Schoenebaum, P.L.C., Des Moines, for appellees D & K Managing

Consultants and Keith Koskela.

      Jesse Linebaugh, Angela Morales, and Christina Lesko of Faegre, Baker,

Daniels, L.L.P., Des Moines, for appellee MPS Group, Inc.


      Heard by Vogel, P.J., and Vaitheswaran and Potterfield, JJ.

**VAITHESWARAN, J.**

A company faced with competition from a former subcontractor, former employees, and the former employees' new employer sued for breach of contract, intentional interference with prospective business advantage, and intentional interference with contract. The district court considered and rejected the claims following trial. On appeal, the company challenges the court's treatment of certain default admissions and the court's conclusions on the merits.

## I. *Background Facts and Proceedings*

Seneca Waste Solutions, Inc. is in the business of cleaning ethanol manufacturing plants. Seneca subcontracted work to D & K Managing Consultants, L.L.C., owned by David Koskela. David signed a "vendor supplier confidentiality agreement." The agreement defined "confidential information" of Seneca as "any non-public proprietary information or technology used in [Seneca's] business, and any materials evidencing the same." The agreement prohibited D & K from allowing access to the confidential information.

Seneca also required D & K employees to sign a "subcontractor confidentiality and non-compete agreement." This agreement, effective for three years, precluded the signatories from "directly or indirectly, solicit[ing] or attempt[ing] to solicit business from or perform any services or work similar to the services or work contracted for herein for any customers of Seneca Waste Solutions, Inc. within a seven (7) state marketing area including Iowa." The agreement also prohibited the unauthorized disclosure of confidential information.

The district court found that David Koskela's son, Keith, who worked for D & K and provided services to Seneca, signed a subcontractor confidentiality and non-compete agreement.[1] Another employee of D & K, Shawn Mullihan, did not sign an agreement.

Eventually, Seneca and D & K parted ways. D & K sold its equipment and assets to MPS Group, Inc., a company looking to enter the ethanol cleaning industry. The sale followed on the heels of a marketing presentation D & K made, which characterized Seneca as a competitor and included information about Seneca's operational expenses.

MPS hired Keith Koskela and Mullihan to assist in starting the new venture. MPS foresaw Mullihan as being the "lead operations person responsible for project delivery." He would be involved in the "initial planning and selling activities" because he had "good client contacts and brings instant credibility in the ethanol market to our efforts." Keith Koskela would provide "on-site supervision" and "administrative and management support to Shawn's team through completion of purchase orders, daily job report submittal, margin management and other management support functions."

When Seneca learned of these hires, company manager Alan Charles articulated the threat to its business as follows:

> In the marketplace, Mullihan has our customer contact list derived from his use of his personal Blackberry while at Seneca. (he was promoted to lead but not allowed a Blackberry so he used his own.) He is showing customers tools, pump literature, specs, etc. to prove he has the exact same equipment that we do at half the price.

---

[1] Keith vehemently denied signing the agreement and asserted his claimed signature was a forgery. The district court found otherwise. The validity of his signature is not an issue on appeal.

Customers are talking about this to our field people and its shaking them up. Your call what to do about it but I suggest you confer with all your Supervisors to confirm what I'm saying and formulate a response.

We've heard a lot about Mullihan being busy chasing ethanol plants and gaining a couple customers but so far nothing about Keith Koskela and the industrial work. i.e. John Deere, Pella, Vermeer, etc. However, I'm certain he's on it. As I said before, I'm not concerned about Keith getting into my book of business. He's weak in ethanol and he has Mullihan to handle that. To be safe, I would assume that Keith is working aggressively to secure industrial work. Unfortunately, I'm afraid you may have to mount another mini-PR campaign similar to the anti-union effort.

Seneca's attorney proceeded to inform MPS of Keith Koskela's non-compete agreement. Several months after receiving the notice and investigating the issue, MPS pulled Koskela out of Iowa.

In time, Seneca sued D & K, Keith Koskela, and MPS for anti-competitive practices and disclosure of confidential information. Seneca specifically alleged Keith Koskela breached his contract with Seneca by "using confidential information belonging to Seneca to solicit work from Seneca's customers." Seneca further alleged D & K breached its contract with Seneca by failing to abide by the terms of its vendor supplier confidentiality agreement and by "allowing its employee, Keith Koskela, to use confidential information belonging to Seneca to solicit work from Seneca's customers." Finally, Seneca alleged all the defendants intentionally interfered with prospective business advantage and intentionally interfered with contract.

Seneca moved for summary judgment. The district court granted the motion as to Keith Koskela, relying on Seneca's requests for admissions to him, which were deemed admitted based on his failure to submit timely responses. The court stated, "[t]his proves Seneca's breach of contract claim except for the

amount, if any, of its damages." The court granted injunctive relief against Koskela and denied the summary judgment motion as to the remaining defendants.

The case proceeded to trial. The district court rejected all the claims, including those against Koskela. In large part, the court concluded Seneca failed to establish that the defendants were the cause of Seneca's damages. Seneca appealed following the denial of posttrial motions.

## II. Scope of Review

As a preliminary matter, the parties disagree on whether our scope of review is de novo or on error. Seneca argues in favor of de novo review while MPS contends the case was tried as a law action, signaling review for errors of law.

An action based on a contract is normally treated as one at law. *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178-79 (Iowa 2010). If the petition seeks both legal and equitable relief, the action is ordinarily classified according to what appears to be its primary purpose or its controlling issue. *Id.* (citing *Mosebach v. Blythe*, 282 N.W.2d 755, 758 (Iowa Ct. App. 1979)).

This action has indicia of both a law and equity action. The petition contained a damage request, the district court ruled on objections, and the district court filed a document styled "findings, conclusions of law and judgment" rather than a "decree," all hallmarks of a law action. *Van Sloun,* 778 N.W.2d at 178. At the same time, the court granted injunctive relief against Koskela and reserved ruling or took answers subject to the objection, both hallmarks of an equity action. *Passehl Estate v. Passehl*, 712 N.W.2d 408, 413-14 (Iowa 2006).

Because the result we reach would be the same whether we review the action in law or equity, we will treat the action as one in equity and review the record de novo. *See Klein v. City of Keokuk*, 438 N.W.2d 22, 23 (Iowa Ct. App. 1989). This type of review is feasible because no one disputes the completeness of the record. S*ee Howard v. Schildberg Const. Co., Inc.*, 528 N.W.2d 550, 552-53 (Iowa 1995); *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980).

### III.    Analysis

Seneca raises the following issues on appeal: (A) whether the district court gave proper effect to Keith Koskela's default admissions; (B) whether the district court gave proper effect to its summary judgment ruling; (C) whether D & K breached its non-disclosure agreement; (D) whether the defendants interfered with Seneca's prospective business advantages; (E) whether the defendants interfered with Seneca's contractual relations; (F) whether MPS is jointly and severally liable for Koskela's conduct; (G) whether MPS is vicariously liable for Koskela's conduct; and (H) whether Seneca is entitled to punitive damages. For reasons that will become apparent, we find it unnecessary to address issues (B), (F), (G), and (H).

### A.  Default Admissions

As noted, Seneca moved for summary judgment, relying in part on Keith Koskela's default admissions. The following request for admission is the most pertinent:

> Keith Koskela submitted a bid to Biofuel Energy Corp., Buffalo Lake Facility, in Fairmont, MN, knowing that Biofuel Energy Corp. was a Seneca customer and Seneca had already submitted a bid for that same work, causing Biofuel Energy to cancel its purchase order with Seneca and to award the work to MPS.

In granting the motion as to Koskela, the district court reasoned as follows:

> It is self-evident that Keith's admissions and the matters included in Seneca's supplemental submission in support of its motion establish that Keith is a party to the non-compete agreement and that Keith breached the terms of that agreement by soliciting business competitive with Seneca's business and by using Seneca's confidential information. This proves Seneca's breach of contract claim except for the amount, if any, of its damages. . . . Seneca does not adequately argue how the facts it has established support its other claims against Keith. The court does not expect to have to determine the elements of a claim and then argue how the undisputed facts established by a party support that claim. To the extent the establishment of the breach of contract claim supports elements of the other claims, those elements are established. Any party may pursue any further dispositive motion if deemed appropriate.
> No money judgment will be entered against Keith on the breach of contract claim or for costs or attorney fees until the entire case is ready for disposition and the amounts of damages to which Seneca is entitled, if any, are established.

After trial, the district court addressed its summary judgment ruling as follows:

> As noted, the court has entered summary judgment against Keith on the contract claim, reserving for trial the issue of damages. While the court's summary judgment may not make it clear that causation—not merely the amount—of damages remained undecided, that was the court's intent and that is only fair. Summary judgment was entered solely on the basis of Keith's admissions, by operation of law. None of those admissions would suffice as proof, or support the legal conclusion, that Keith's violations of the terms of the non-compete agreement caused the damages about which Seneca complains.

The district court went on to find as follows:

> There is no evidence that MPS (or even Keith) knew of the existence of this purchase order. Moreover, even if MPS knew of the existence of the purchase order, this element could not be established without also establishing that MPS knew (or, at least, had reason to know) that the purchase order was a contract. The evidence in this record does not justify such a conclusion. There is no evidence that MPS knew the specific history of Seneca's contact with the customer in relation to this purchase order, including the absence of any evidence that the customer gave MPS a reason to know that it did not have the right to unilaterally cancel the order. In

sum, neither the direct nor the circumstantial evidence establish a reason why MPS must have known that the purchase order existed or, if it did know that, that it knew the purchase order was bonding on the customer.

Seneca argues the district court's finding in its trial ruling was "directly contrary to the preclusive default admissions." Additionally, Seneca contends the district court should not have permitted Koskela and MPS to present evidence contradicting the admissions.

Iowa Rule of Civil Procedure 1.510 governs admissions. The rule states:

A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of rule 1.503 set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request.

Iowa R. Civ. P. 1.510(1). Rule 1.511 prescribes the effect of an admission as follows: "Any matter admitted under rule 1.510 is conclusively established in the pending action unless the court on motion permits withdrawal or amendment of the admission." Iowa R. Civ. P. 1.511; *Uthe v. Time-Out Family Amusement Ctrs.*, 475 N.W.2d 635, 638 (Iowa Ct. App. 1991). Because both rules are modeled on Federal Rules of Civil Procedure 36(a) and (b), we may look to federal case law in construing them. *Compare* Iowa R. Civ. P. 1.510, 1.511 *with* Fed. R. Civ. P. 36; *see generally City of Davenport v. Newcomb*, 820 N.W.2d 882, 890 (Iowa Ct. App. 2012) (holding "[w]here an Iowa rule of civil procedure is patterned after a federal rule, interpretations of the federal rule are persuasive.").

As noted, the district court's summary judgment ruling stated the elements of Seneca's breach-of-contract claim against Keith Koskela were "conclusively established" but for "the amount, if any" of damages. In the order portion of the

ruling, the court reiterated, "it is established *for all purposes of this litigation*, that the defendant Keith Koskela is a party to the written agreement . . . and that the defendant Keith Koskela breached that agreement by soliciting business and using confidential information in violation of its terms." (Emphasis added.) The court had authority to bind Keith Koskela to these ultimate facts. *See Allied Gas & Chem. Co. Inc. v. Federated Mut. Ins. Co.*, 332 N.W.2d 877, 880 (Iowa 1983) (noting an admission may relate "to an ultimate fact or to an issue that is dispositive of a case"). Koskela requested that the court reconsider its ruling on his admissions, but the court rejected the request, stating:

> Koskela offers this analogy to explain his argument:
>> A simple analogy involves a traffic accident. If one party fails to timely deny a request for admission, stating that the light was red when he crossed the intersection, it is not established as undisputed as a matter of law if **multiple** other parties witnessing the accident answered the exact same request for admission by properly denying the light was red. (bold italics in original)
>
> The court does not think this is a very good analogy in the first place since the truth of the fact at issue here is uniquely within the scope of the knowledge of one human being. The better analogy would ask whether a person could be absolved of an admission that he was driving the car when it went through the red light when others denied that fact. One would want some explanation of why the person who admitted driving the car couldn't know whether he was driving the car or not, or why he would lie about it, before rationally concluding there was a genuine fact issue as to whether he was driving the car.
>
> But this whole argument misses the point. This is not a dispute about whether Koskela actually signed the contract. And, contrary to the language of the analogy, it is not merely that Koskela "failed to timely deny" that he signed the contract. As discussed below, whether he actually signed it may be disputed by others who did not make the admission if that is a relevant fact affecting their legal rights. But, as for Koskela, the fact that he signed the contract is, under Iowa R. Civ. P. 1.511, "conclusively established." There is no support (and none is cited) for Koskela's statement that a fact "is not established as undisputed as a matter

of law" as to the party making the admission if other parties dispute it.

Accordingly, the admissions—including the admission quoted above—were binding on Keith Koskela with respect to Seneca's breach-of-contract claim against him.

To hold otherwise would be to ignore the language and import of rule 1.511. *See United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987) ("Rule 36 allows parties to narrow the issues to be resolved at trial by effectively identifying and eliminating those matters on which the parties agree. This function would be lost if parties were permitted to contest under Rule 56 a matter concluded under Rule 36."); *Hardwick v. John and Mary E. Kirby Hosp.*, 860 F. Supp. 2d 641, 649-50 (C.D. Ill. 2012) ("[A]dmissions, including default admissions, must be treated as conclusively established for purposes of summary judgment, and it is error for a district court judge not to give an admission such effect."); 8B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2264 (3d ed. 2010) ("The salutary function of Rule 36 in limiting the proof would be defeated if the party were free to deny at the trial what he or she has admitted before trial"). As the advisory committee for the federal rules has observed, "[u]nless the party securing an admission can depend on its binding effect, he [or she] cannot safely avoid the expense of preparing to prove the very matters on which he [or she] has secured the admission, and the purpose of the rule is defeated." Fed. R. Civ. P. 36 advisory committee's note.

Additionally, the prejudice to Seneca of holding otherwise is apparent. *Allied Gas & Chem.*, 332 N.W.2d at 880 ("Other courts have found prejudice where a party is suddenly required to prove matters otherwise admitted."). Seneca reasonably could have expected it would not have to prove anything other than the "amount of damages, if any," on its breach-of-contract claim against Koskela. *See id.* ("Plaintiff had every right to assume that when denials were not forthcoming to his Request for Admissions within 30 days of September 22, 1981, that they involved matters he would not be called upon to prove."). This expectation was frustrated.

As relief, Seneca requests reversal and a judgment award on its "breach of contract and intentional interference with contract claim in the amount of $957,076 as established by the default admissions and damage evidence presented at trial." This request reaches well beyond the parameters of the conclusively-established admissions. First, the court's summary judgment ruling made clear the admissions were not binding on Seneca's remaining claims against Koskela except "[t]o the extent the establishment of the breach of contract claim supports elements of the other claims." Second, Seneca's proof of the amount of damages was hotly contested. With respect to D & K, a failure of proof on this element is dispositive, as discussed below. Finally, in a ruling on a motion for reconsideration of the summary judgment ruling, the court clarified that the admissions held no more than "evidentiary value" against MPS. This ruling was correct; the admissions could not bind either MPS or D & K. *See Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997); *Alipour v. State Auto. Mut. Ins. Co.*, 131 F.R.D. 213, 215-16 (N.D. Ga. 1990); *Kittrick v. GAF Corp.*, 125 F.R.D. 103,

106 (M.D. Pa. 1989); *Alba v. Hayden*, 237 P.3d 767, 770-71 (N.M. Ct. App. 2010); *Darnall v. Petersen*, 592 N.W.2d 505, 510-11 (Neb. Ct. App. 1999); 8B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2265 n.37, at 400-01 (3d ed. 2010) (stating "[t]he admission does not bind the party who requested it. . . . Nor do the admissions of a party bind a coparty."); 32 C.J.S. *Evidence* § 561 (noting "[d]eclarations of a defaulted defendant are generally inadmissible against his co-defendant"). *See also Poulsen v. Russell*, 300 N.W.2d 289, 298 (Iowa 1981) (declining to bind requesting party to admissions). In short, the default admissions did not mandate entry of a money judgment against Koskela and the remaining defendants on all the claims.

At most, Seneca was entitled to an order foreclosing Koskela from contradicting his binding admissions at trial. *See* Iowa R. Civ. P. 1.511 (noting admission is "conclusively established"); *Pflepsen v. Univ. of Osteopathic Med.*, 519 N.W.2d 390, 392 (Iowa 1994) (concluding admission, although "improvident," bound university); *Double D Land & Cattle Co., Inc. v. Brown*, 541 N.W.2d 547, 552 (Iowa Ct. App. 1995) (concluding affidavits could not refute admissions in summary judgment ruling). The district court permitted contradictory testimony from Koskela. On our de novo review, we ignore the contradictory testimony.

This leaves us with the district court's conclusion that the "amount, if any" of damages against Koskela was zero because Koskela was not the cause of damages to Seneca. Generally, the plaintiff has the burden of proving damages. *Data Documents, Inc. v. Pottawattamie Cnty*, 604 N.W.2d 611, 616-17 (Iowa 2000). If the record is uncertain and speculative as to whether a party has sustained damages, the factfinder must deny recovery. *Id.* "But if the uncertainty

is only in the amount of damages, the fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can infer or approximate the damage." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996).

The admission quoted above establishes Keith "caus[ed]" Biofuel Energy (BFE) to cancel its purchase order with Seneca and to award the work to MPS. The undisputed amount of the cancelled purchase order was $285,000. Accordingly, Seneca was entitled to a damage award of $285,000 against Keith Koskela on the breach-of-contract claim against him.

With respect to the remaining claims against Koskela, we find the evidentiary value of the admission also is dispositive of the intentional interference with contract claim. We will address that claim in more detail below. The evidentiary value of the admission is not dispositive of the claims against the remaining defendants, as will be explained below.

### B. Inconsistency With Summary Judgment Ruling

Our resolution of the admissions question also resolves Seneca's second issue: whether the district court gave proper effect to its own summary judgment ruling. As noted, we agree the court did not.

### C. Whether D & K breached its non-disclosure agreement[2]

To prevail on its breach-of-contract claim against D & K, Seneca must prove the following elements: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) performance of all the terms and conditions

---

[2] D & K raises an error preservation concern with this argument which we find unpersuasive.

required under the contract (or excuse from such performance), (4) the defendant's breach of the contract in some particular way, and (5) damage as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The first three elements are not at issue. The focus is on the fourth element—whether D & K breached the "vendor supplier confidentiality agreement" by disclosing confidential information. Seneca contends D & K "clearly breached the confidentiality agreement in its marketing presentation to MPS, which included Seneca's gross profit margins."[3]

The marketing presentation materials included a standard rate sheet for Seneca Waste Solutions.[4] The sheet listed labor and overtime charges for various positions, equipment charges, and incidental charges. David Koskela testified these were the rates D & K charged Seneca and he was unaware of the rates Seneca passed on to its customers. He "assumed" Seneca's pricing, rate sheets, and gross profit margin information would be confidential. Another individual who attended the presentation, Darrin Stafford, recalled requesting and receiving data on profit margins MPS could expect. He conceded this information would be confidential.

On our de novo review, we conclude the standard rate sheet included with the marketing presentation materials was confidential even though the sheet did not refer to Seneca's customer-pricing data. The vendor supplier confidentiality

---

[3] Seneca preliminarily claims it is entitled to a default judgment against D & K based on D & K's failure to obtain counsel. Suffice it to say the default was cured prior to trial.
[4] While the chief executive officer of MPS disputed the rate sheet was attached, the trial exhibit included it.

agreement's definition of "confidential information" broadly referred to "any non-public proprietary information or technology used in [Seneca's] business, and any materials evidencing the same." The rate sheet fell within this definition. As for information concerning the profits MPS could expect, there can be no question this information—to the extent it was based on Seneca's profits—was confidential. Having concluded the contested information was confidential, we further conclude D & K breached the agreement by disclosing confidential information.

This brings us to the fifth element: damage as a result of the breach. Damages for breach of contract are limited to "those injuries which may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as a probable result of the breach." *R.E.T. Corp. v. Frank Paxton Co., Inc.*, 329 N.W.2d 416, 420 (Iowa 1983) (citing *Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976)); *see also Vogan v. Hayes Appraisal Assoc., Inc.,* 588 N.W.2d 420, 425 (Iowa 1999) (stating damages for breach of contract are those either arising naturally from such breach or those that may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach). "The damages claimed must be the certain result of the alleged breach on which the injured party relied." *City of Corning v. Iowa-Nebraska Light & Power Co.*, 282 N.W. 791, 796 (Iowa 1938).

The district court found a failure of proof on this element. On our de novo review, we agree with the district court. Seneca's damages were premised on

lost revenues from lost customers. But those customers were not lost as a result of D & K's disclosure of confidential information to MPS but (1) as a result of Mullihan's significant efforts on behalf of MPS, efforts he made without the constraints of a confidentiality agreement and (2), in the case of BFE, Keith Koskela's breach of the non-compete agreement. Seneca executive Alan Charles conceded Mullihan's significant role, stating in an internal e-mail, "Mullihan has our customer contact list derived from his use of his personal Blackberry while at Seneca. . . . He is showing customers tools, pump literature, specs, etc. to prove he has the exact same equipment that we do at half the price." Similarly, Seneca branch operations manager, Shawn Von Stein, explained that Mullihan knew more than Keith Koskela about the ethanol cleaning business because "he went to more plants than Keith would have."

Mullihan began his efforts to undercut Seneca's business long before he joined MPS. While working for Seneca as an employee of D & K, Seneca cited him for referring one of its customers to a competitor. There was also evidence Mullihan asked a Seneca employee to break into an office and pilfer proprietary information on behalf of D & K.

When Mullihan arrived at MPS, he became the "lead guy" who "had the relationships," according to MPS employee Darrin Stafford. Stafford stated, "the content of the proposals was—the genesis was from Shawn Mullihan and he had input on all of it." In fact, after MPS decided to pull Keith Koskela from Iowa, Stafford testified there was no disruption to MPS's marketing efforts in Iowa because Mullihan had already "asserted himself as the leader and quite frankly could do that on his own without Keith." As the district court stated, Mullihan's

"knowledge of the business and his connections with the customers" was "[w]hat enabled" MPS "to immediately step in and start to compete with Seneca."

Seneca presented scant if any evidence to tie Mullihan's marketing efforts in Iowa to the information D & K disclosed during the marketing presentation—a presentation Mullihan did not attend. The cancellation of the purchase order with BFE Fairmont is a case in point. While Seneca lays the cancellation at D & K's doorstep, the record reflects D & K's owner, David Koskela, had no knowledge of what Seneca charged its customers and no involvement with this purchase order. As for Keith Koskela's actions, he had no role in D & K at the time of his solicitation of BFE's business.

Because Seneca failed to prove the damage element, we affirm the district court's denial of Seneca's claim for breach of contract against D & K.

### D. Interference with Seneca's Prospective Business Advantage

Next, Seneca contends the district court should have found each of the defendants liable for intentional interference with prospective business advantage. Intentional interference with a prospective business advantage requires the plaintiff to prove (1) the plaintiff had a prospective business relationship; (2) the defendant knew of the prospective relationship; (3) the defendant intentionally and improperly interfered with the prospective relationship; (4) the interference caused the third party not to enter or continue the relationship; and (5) the amount of damages. *Nesler v. Fisher and Co., Inc.*, 452 N.W.2d 191, 196-99 (Iowa 1990); *see also Jones v. Univ. of Iowa*, 836 N.W.2d 127, 151 (Iowa 2013) (stating "[t]he tort of intentional interference with prospective business advantage imposes liability on a person who intentionally

and improperly interferes with the claimant's business expectancies 'whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.'"). This tort is also referred to as "intentional interference with prospective contractual relation." *See* Restatement (Second) of Torts § 766B (1979); *see also Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 283 (Iowa 1998) (referring to tort as "interference with a prospective contract"); *Burke v. Hawkeye Nat. Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991) (referring to tort as intentional interference with prospective contract or business relationship).

### (1) Keith Koskela

As noted, the summary judgment ruling against Keith Koskela and the admissions we have found to bind him on the breach-of-contract claim against him are not dispositive of this claim, although they may have evidentiary value. Accordingly, we consider the elements of the cause of action.

There is no question Seneca had a business relationship with the customers alleged to have been targeted—BFE, Green Plains Energy (GPRE), and Plymouth Energy. This relationship met the definition of prospective business advantage. *See* Restatement (Second) of Torts § 766B, cmt. *c* (1979) (stating "the relations protected . . . include any prospective contractual relations . . . if the potential contract would be of pecuniary value to the plaintiff.").

The second element—whether Koskela knew of the ongoing relationships—is established by Koskela's default admission concerning his knowledge of Seneca's purchase order with BFE at the time a bid was submitted

and BFE's subsequent cancelation of the purchase order with Seneca. Additionally, Mullihan was known to have Seneca's customer list and it is clear Mullihan and Keith Koskela worked together. This element was proven.

We turn to the third element—whether Koskela intentionally and improperly interfered with Seneca's prospective business advantage. Seneca is "held to a strict standard of substantial proof 'that the defendant acted with a predominantly improper purpose.'" *Tredrea*, 584 N.W.2d at 287 (quoting *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 341 (Iowa 1991)). Improper purpose is a desire to "injure or financially destroy the plaintiff." *Compiano v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 462, 464 (Iowa 1999).

Seneca did not satisfy this strict standard. Certainly, Koskela wished to compete with Seneca and took action to solicit business from customers he knew to have worked with Seneca. But, even considering the evidentiary value of his default admissions, we are hard-pressed to find that his predominant purpose was to financially injure or destroy Seneca. Because this element was not satisfied, we agree with the district court's denial of the claim. We find it unnecessary to address the final two elements.

### *(2) D & K*

In support of its contention that D & K should be held liable for interference with prospective business advantage, Seneca asserts "MPS acted in concert with Keith Koskela and D & K to solicit work away from Seneca's customers knowing that Koskela was in breach of his duties under the non-compete agreement."

This assertion does not speak to the elements of the cause of action for intentional interference with prospective business advantage.

Our de novo review reveals the following pertinent facts. By the time Keith Koskela and Mullihan began soliciting business in Iowa on behalf of MPS, D & K was a shell, with no ethanol cleaning equipment and no employees. Keith Koskela and Mullihan had been laid off before David Koskela made the marketing presentation to MPS, and David Koskela took no part in MPS's subsequent marketing efforts. Even if D & K could be charged with knowledge of Seneca's prospective business relationships based on its past dealings with the company, there is simply no evidence to establish D & K intentionally and improperly interfered with the prospective relationship, the interference caused Seneca not to enter or continue the relationship, and damages resulted from the interference. The district court appropriately denied this claim.

### (3) MPS

We are left with Seneca's claim against MPS. As with the other defendants, this claim fails on the third element—intentional and improper interference with the prospective business relationship.

First, the marketing materials Seneca cites, which indeed referred to Seneca as a competitor, were not generated by MPS but by D & K. Second, MPS did not take the presentation as a call to injure or financially destroy Seneca. To the contrary, the chief executive officer of MPS, Ed Schwartz, disavowed counsel's characterization of the materials as a direct target of Seneca's ethanol customers. He viewed D & K's offer of access to Seneca's ethanol customers as "salesmen talk." Schwartz was simply looking for

verification of D & K's assets, which he ultimately purchased, together with a three-year non-compete agreement signed by David Koskela. Third, to the extent Seneca relies on MPS's hiring of Keith Koskela, Schwartz testified he "had no idea there was a non-compete" agreement between Keith Koskela and Seneca. Notably, MPS pulled Keith Koskela from the Iowa market after investigating Seneca's request to abide by the agreement. The district court appropriately denied this claim.

### E. Interference with Seneca's contracts

Seneca next challenges the district court's denial of its claims for interference with its contractual relationships. A successful claim for intentional interference with a contract requires proof that (1) plaintiff had a contract with a third party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) the amount of damage. *Nesler*, 452 N.W.2d at 199. The first two elements are satisfied with respect to all the defendants.

The third element requires application of a different standard from the standard for interference with prospective business advantage. *Id.* When dealing with existing contracts, a purpose to injure or destroy the plaintiff is not essential. *Id.* (citing *Farmers Co-op Elevator, Inc., Duncombe v. The State Bank*, 236 N.W.2d 674, 679 (Iowa 1979)). The following factors are relevant to deciding whether the conduct was improper:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference, and
(g) the relations between the parties.

*Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008). We find it unnecessary to separately address each of the factors with respect to each of the defendants. Instead, we will summarize the pertinent evidence relating to each defendant. If necessary, we will then proceed to analyze the fourth and fifth elements.

### (1) Keith Koskela

With respect to Keith Koskela, the default admissions and specifically the admission relating to his contact with BFE establishes improper conduct.[5] We proceed to the fourth element—whether the interference caused the third-party not to perform. The admission also establishes this element as to BFE, and Seneca's damages at trial were shown to be $285,000. As discussed extensively, Mullihan's involvement precludes a finding that Keith Koskela's improper interference resulted in the loss of Seneca's contracts with the remaining specified customers. Accordingly, Seneca's claim against Keith Koskela for intentional interference with contract as to those customers fails.

---

[5] Quoted above, the pertinent admission read: Keith Koskela submitted a bid to Biofuel Energy Corp., Buffalo Lake Facility, in Fairmont, MN, knowing that Biofuel Energy Corp. was a Seneca customer and Seneca had already submitted a bid for that same work, causing Biofuel Energy to cancel its purchase order with Seneca and to award the work to MPS.

*(2) D & K*

D & K's disclosure of confidential information in violation of the vendor agreement establishes improper conduct. But, as with the improper interference with prospective business advantage claim, there is no evidence to establish D & K interfered with Seneca's customer contracts. Accordingly, this claim fails.

*(3) MPS*

This brings us to MPS. Seneca contends it had exclusive contracts with (1) BFE Fairmont, (2) BFE Woodriver, (3) GPRE, and (4) Plymouth Energy. In its view, Keith Koskela "directly solicited work from each of these customers lost to MPS."

All involved conceded MPS competed with Seneca for ethanol cleaning business. But competition for competition's sake generally is not improper. *See* Restatement (Second) of Torts § 768 (1979); *see also Edward Vantine Studios, Inc. v. Fraternal Composite Serv., Inc.*, 373 N.W.2d 512, 515 (Iowa Ct. App. 1985) (holding promise to indemnify customer was tortious but "[i]f the contracts had been terminated by reason of better price, better service, or better quality alone, . . . the Court would not have determined there was a tortious interference with the contracts."). As discussed in other sections, all these customers were solicited in part by Mullihan, who was not subject to a non-compete agreement with Seneca. His efforts on behalf of MPS were in in no way improper.[6]

---

[6] Keith Koskela's default admission establishes that his involvement in soliciting business from BFE Fairmont was improper but, as noted at the outset, the admission cannot bind MPS. Additionally, we are not persuaded by Seneca's contention that MPS "acted in concert with Keith Koskela . . . to solicit work away from Seneca's customers, knowing that Keith Koskela was in breach of his duties under the non-compete agreement." As noted, MPS did not know Keith Koskela had a non-compete agreement.

Because he was the primary face of MPS in soliciting business and he acted appropriately, our analysis of the third element could end here. However, we elect to delve a little deeper.

First, with respect to BFE Fairmont, two contracts are at issue: (1) the purchase order and (2) the original contract for services with Seneca. Beginning with the purchase order, there is no question Keith Koskela (and Mullihan) solicited business from BFE Fairmont. There is also no question—based on Keith Koskela's default admission—that, as a result, BFE Fairmont canceled a purchase order with Seneca. We have found Keith Koskela liable for interference with this purchase order contract. But we cannot find Keith Koskela or MPS liable for interference with the second contract because this contract had expired at the time Keith Koskela and Mullihan began soliciting business from BFE Fairmont.

Second, with respect to BFE Woodriver, Seneca claimed interference with work performed in April 2011 but, again, the service contract had expired a month earlier.

Turning to GPRE, the company had a number of branches and many were not encompassed by Keith Koskela's non-compete agreement, the primary if not sole hook with which Seneca attempts to reel in MPS for improper interference with its contracts. GPRE Superior, Iowa, however, was subject to the non-compete agreement and additionally had a service contract with Seneca that had yet to expire when MPS solicited its business. At first blush, MPS's written offer

_____

This fact disposes of Seneca's "joint and several liability" and "vicarious liability" claims against MPS based on Koskela's conduct.

of services would appear problematic. *See* Restatement (Second) of Torts § 768 cmt. a (1979) ("[A]n existing contract, if not terminable at will, involves established interests that are not subject to interference on the basis of competition alone. However, the fact that the actor is not justified on the basis of competition is not conclusive of his liability. His action may be justified for other reasons."). But MPS's offer was just that—an estimate for work MPS was willing to perform for GPRE Superior—unsupported by an acceptance and listing the projected start date as "to be determined." Given the open start date, the offer could have been construed as a request to obtain GPRE Superior's business upon the expiration of Superior's contract with Seneca. As for Seneca's assertion that MPS interfered with contracts at the Shenandoah and Central City facilities, Seneca furnished no separate contracts with these facilities for 2012, when MPS performed work.

We are left with Plymouth Energy. MPS attempted to solicit business from Plymouth but was informed Plymouth still had contractual obligations with Seneca. MPS performed no work for Plymouth during the contract period.

Based on this evidence, in addition to the evidence of Mullihan's appropriate contacts on behalf of MPS, we conclude MPS did not improperly interfere with Seneca's contracts. Because this element is unsatisfied, we need not address the final two elements as they relate to MPS.

### IV. Disposition

We affirm the dismissal of the breach-of-contract claim against D & K, the dismissal of the tortious interference with prospective business advantage claims against all the defendants, and the tortious interference with contract claims

against D & K and MPS. We reverse the dismissal of the breach-of-contract claim and the tortious interference with contract claim against Keith Koskela and remand for entry of a single judgment against him in the amount of $285,000. *See Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 770 (Iowa 1999) ("A successful plaintiff is entitled to one, but only one, full recovery, no matter how many theories support entitlement." (citing *205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994)) (internal quotation marks omitted)); *Team Central, Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 924-26 (Iowa 1978).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**